UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PHILIP A. BROWNE, )
)
Plaintiff, )
)
v. ) Case No. 1:05CV01177 (RWR)
)
POTOMAC ELECTRIC POWER )
COMPANY, )
)
Defendant. )

## DECLARATION OF EILEEN M. APPUGLIES

1. I am over 18 years-old and otherwise competent to give this testimony, which I make based upon my own personal knowledge.

2. I have been employed by Potomac Electric Power Company ("Pepco") for 22 years, and I am currently the Manager of Human Resources Business Partners – Pepco. I am responsible for the administration of the various services and benefits provided to Pepco employees. One of my duties is to oversee and coordinate the resolution of employees' concerns regarding any aspect of their employment, including salary issues, discipline, compliance with Pepco policies and procedures, and discrimination and harassment claims.

3. As a result of my duties, I am familiar with the employment history of Philip A. Browne ("Mr. Browne"), the complaint he filed with respect to alleged discriminatory conduct, the discipline issued to him in July 2004, and the reasons for that discipline.

4. Pepco hired Mr. Browne as a Supervisor Engineering Liaison on February 20, 2001. In that position, he is a liaison with local government agencies, facilitating the process of obtaining permits for Pepco construction projects relating to the

installation and relocation of electrical services. From the date of his hire until December 2004, Mr. Browne was supervised by Kenneth Farrell, Manager of Distribution and Transmission Engineering.

5. On September 10, 2003, Pepco posted an "Internal Job Posting Notice" for the position of General Supervisor Distribution Support Services. Mr. Browne and three other candidates applied for the position. After structured interviews were conducted, Theodore Karnezis, a white candidate, was selected for the position. Mr. Browne and the other two candidates who were not selected were informed of Pepco's decision on or around November 3, 2003.

6. On or around June 2, 2004, I received notice from Melissa Sharpe-Jones, an Investigator at the D.C. Office of Human Rights ("DCOHR"), that Mr. Browne had filed a charge of discrimination with the DCOHR regarding his non-selection for the position of General Supervisor. The charge, which was attached to Ms. Sharpe-Jones's letter, was filed on May 6, 2004, and in it Mr. Browne claimed that he was more qualified than Mr. Karnezis and that his non-selection was due to his race. Pepco, by counsel, submitted a position statement to the DCOHR denying that it discriminated against Mr. Browne.

7. On December 13, 2004, Pepco received a copy of the DCOHR's Letter of Determination, addressed to Mr. Browne, in which it found no probable cause that Pepco had discriminated against Mr. Browne. In April 2005, I received a copy of the Dismissal and Notice of Rights issued to Mr. Browne by the Equal Employment Opportunity Commission ("EEOC"). According to the notice, the EEOC adopted the findings of the DCOHR.

8. In July 2004, Pepco took disciplinary action against Mr. Browne for two incidents that occurred in April and June 2004.

9. The first of these two incidents involved Pepco's employee-parking policy. Theodore Karnezis, the General Supervisor who is responsible for administering the

parking policy, noticed that an employee who is supervised by Mr. Browne was consistently violating the policy. In an email sent on April 16, 2004, Mr. Karnezis asked Mr. Browne to instruct the employee to comply with the rules. Mr. Browne wrote a reply email the same day in which he criticized the parking policy, reprimanded Mr. Karnezis (who was a fellow supervisor, not a subordinate), and refused to remind the employee of the need to follow the policy. Mr. Browne did not instruct his employee to follow the parking rules until he was asked to do so several days later by his own supervisor, Mr. Farrell.

10. The second incident leading to Mr. Browne's discipline occurred on June 23, 2004, the eve of a vote on the ratification of the Collective Bargaining Agreement between Pepco and the Union that represents hundreds of its employees. Mr. Browne sent an email to Mr. Farrell (which was copied to William Gausman, Pepco's Vice President of Asset Management, and to me) with an attached memorandum that expressed his strong disagreement with the position Pepco had taken during the contract negotiations on a job classification issue. He also sent a copy of this email and the attached memorandum criticizing Pepco's position to Union officials.

11. Because it was inappropriate for Mr. Browne – a non-Union, management employee – to criticize the company on the eve of a contract vote, and to communicate this criticism to the Union itself, Mr. Gausman sent an email to Mr. Browne on June 23 instructing him to refrain from communicating with the Union without first consulting his manager. Despite this instruction, Mr. Browne sent another email to the Union on this same topic on July 9, 2004.

12. Based on these two incidents, Pepco decided to take disciplinary action against Mr. Browne. On July 16, 2004, Mr. Farrell met with Mr. Browne to discuss the letter sent to the Union. During this meeting, Mr. Farrell told Mr. Browne that Pepco was

considering discipline because it was highly inappropriate for Mr. Browne to communicate with the Union the day before the vote on the Collective Bargaining Agreement.

13. Ultimately, Pepco determined that Mr. Browne's actions warranted a form of discipline called "Decision-Making Leave," or "DML." I was present in the meeting with Mr. Browne on July 29, 2004 when the DML was issued.

14. DML is usually the final level of formal discipline prior to discharge. Nevertheless, Pepco's progressive discipline policy provides that a DML may be issued without prior discipline where the employee's performance problems are serious enough to warrant it.

15. When a DML is issued, Pepco managers explain to the employee the seriousness of the infractions at issue, and the employee is then given time off work for one day, with pay, to consider whether, in light of the infractions, he wishes to continue to work at Pepco. If the employee decides to remain at Pepco, he remains employed in the same position he held prior to the issuance of the DML and continues to receive the same salary. For the next 18 months after the DML is issued, the employee is expected to perform at a "fully acceptable" level in every area of his position. Any performance-related problem arising during this period and requiring formal discipline could result in the employee's termination. Mr. Browne was also given the opportunity to resign with a severance package if that was his choice.

16. In conformance with this policy, Mr. Browne was given one day off work, with pay, to decide whether he wished to return to Pepco. He informed Pepco on August 26, 2004, that he wanted to continue his current employment. Accordingly, he remains in the same position as before the DML. The 18-month DML period will expire for Mr. Browne on January 29, 2006. Since the DML was issued, Mr. Browne received a pay

increase from $70,410 to $72,522 annually, effective March 1, 2005, and also received a payment of $5670.37 under Pepco's Exempt Incentive Plan on April 1, 2005.

17. The April 2004 and June 2004 incidents were described in Mr. Browne's 2004 performance evaluation, which was completed by Mr. Farrell on January 15, 2005. There are three possible ratings that an employee may receive on an annual performance evaluation – outstanding, fully acceptable, and needs improvement. Mr. Browne received an overall rating of "fully acceptable" – which made him eligible for the pay increase he received in March 2005 – but he received a "needs improvement" rating in two of ten categories. One of these two categories was "Communication," and Mr. Farrell explained in the evaluation that the April and June incidents contributed to Mr. Browne's rating. The fact that Mr. Browne received a DML for these infractions had no bearing on his performance evaluation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on July 1, 2005.

/s/
Eileen M. Appuglies