IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHILIP A. BROWNE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:05-cv-01177-RWR |
| ) | |
| POTOMAC ELECTRIC POWER ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH IT CONTENDS THERE IS NO GENUINE DISPUTE**

Defendant Potomac Electric Power Company ("Pepco"), pursuant to Local Civil Rules 7(h) and 56.1 and in support of its Cross-Motion for Summary Judgment, hereby sets forth its Statement of Material Facts as to which it contends there is no genuine dispute:

1. On May 6, 2004, Plaintiff filed a charge with the D.C. Office of Human Rights ("DCOHR") alleging that Pepco had not selected him for a promotion because of his race. See Ex. 2, at ¶ 6. 1/

2. Months after the DCOHR charge, Pepco took disciplinary action against Plaintiff by issuing him a Decision-Making Leave ("DML"). Ex. 2, at ¶ 8. The DML was based on two incidents of misconduct – an incident in April 2004 relating to Plaintiff's enforcement of the parking policy, and an incident in June 2004 where Plaintiff improperly communicated with the Union that represents some of Pepco's employees. Id.; see also Ex. 1, at 63-64.

3. The parking policy that applied at Pepco's Benning Road facility was reissued to all the supervisors in early 2004. Ex. 1, at 92; Ex. 3. Plaintiff knew that the

---

1/   All citations to Exhibits refer to those exhibits attached to and cited in Pepco's Opposition to Plaintiff's Motion for Summary Judgment/Cross-Motion for Summary Judgment.

parking rules had been reissued, and that he and other supervisors were responsible for ensuring that their subordinates complied with the parking rules. See Ex. 1, at 93-95.

4. One of Plaintiff's subordinates, Renée Carter-Moton, was not complying with the parking policy. See Ex. 3. Ted Karnezis, the Pepco General Supervisor responsible for administering the parking policy, sent Plaintiff an email on April 16, 2004 asking him to ensure that Ms. Carter-Moton and his other subordinates complied with the policy. Ex. 1, at 128; Ex. 3. In response, Plaintiff sent two emails to Mr. Karnezis in which he criticized the parking policy, reprimanded Mr. Karnezis, and stated that he would not remind Ms. Carter-Moton of the need to follow the policy. See Ex. 1, at 128-30; Exs. 4-5. It was only when instructed by his own supervisor Mr. Farrell that Plaintiff finally told Ms. Carter-Moton to follow the parking rules, and even then he made clear that he did not agree with the company's parking policy. See Ex. 1, at 95-96.

5. Plaintiff knew that Pepco was negotiating a collective bargaining agreement ("CBA") with its bargaining unit employees in 2004, and that Pepco had a negotiating team charged with interacting with the Union to negotiate the contract. Ex. 1, at 101. Plaintiff also knew that one of the issues being negotiated was job classifications for certain employees. Id. at 102. Plaintiff was not a member of Pepco's labor negotiating team, and nobody at Pepco ever told him that he could negotiate with the Union on Pepco's behalf or to communicate with the Union about any of the issues that were in negotiation. Id. at 102-04.

6. Plaintiff contacted the Union directly to discuss the job classifications of two of his subordinates, Ms. Carter-Moton and Rosa Daniels. See Ex. 1, at 105-06. On June 23, 2004, the day before the CBA ratification vote, Plaintiff sent a memorandum to Mr. Farrell via e-mail in which he criticized the company's position that Ms. Carter Moton and Ms. Daniels's job classifications should not be upgraded, and he copied two Union officials

on this e-mail (John Coleman and Joe Hawkins), as well as Pepco Vice President William Gausman and Pepco Human Resources Manager Eileen Appuglies. See id. at 106-09; Ex. 6. Plaintiff did not seek or obtain authorization from anyone in Pepco's industrial relations department or the Pepco negotiating team before communicating directly with the Union on this issue. Ex. 1, at 109-110.

       7.     Later in the day on June 23, Mr. Gausman sent Plaintiff a response e-mail, instructing him to refrain from taking any additional action and explaining that his conduct was inappropriate. Ex. 1, at 118; Ex. 7. Despite this admonition, on July 9, 2004, Plaintiff sent Mr. Hawkins another e-mail regarding the job classification issue. See Ex. 1, at 120-22; Ex. 8.

       8.     On July 16, 2004, Plaintiff's supervisor Mr. Farrell informed Plaintiff that Pepco was considering discipline for the Union communication incident and the parking incident. See Ex. 1, at 134-35. Subsequently, Plaintiff met with Mr. Farrell, Mr. Gausman, and Ms. Appuglies on July 29, and they issued him the DML. See Ex. 1, at 148; Ex. 2, at ¶ 13. As is the usual process when a DML is issued, given the seriousness of his infractions, Plaintiff had the option to resign from employment, and he was given one day off work, with pay, to consider this option. Ex. 2, at ¶ 15. Plaintiff informed Pepco on August 26, 2004 that he wanted to continue his current employment. Id. at ¶ 16. The DML went into effect July 29 and expired 18 months later, on January 29, 2006. See id.; see also Ex. 1, at 68-69. On September 2, 2004, Plaintiff received a memorandum from Mr. Farrell confirming the issuance of the DML. Ex. 1, at 150; Ex. 9.

       9.     The DML did not have any effect on Plaintiff's position, salary, or benefits. See Ex. 2, at ¶¶ 15-16. Since the DML, Plaintiff has received a pay increase and a special incentive payment for exempt employees, has received performance evaluations at the "fully acceptable" level or above, and has not been demoted, suspended, or received any

other formal discipline. See Ex. 1, at 66-67. There is no Pepco policy disqualifying any employee under DML from seeking promotions. Id. at 54-55.

10. In January 2005, Plaintiff received his 2004 performance evaluation, which was completed by Mr. Farrell. Ex. 2, at ¶ 17. There are three possible ratings that an employee may receive on an annual performance evaluation – "outstanding," "fully acceptable," and "needs improvement." Id. Plaintiff received an overall rating of "fully acceptable" on his evaluation. Id.; see also Ex. 1, at 152; Exhibit 10, at 3. Prior to 2004, Plaintiff had never received a performance evaluation with an overall rating higher than "fully acceptable." See Ex. 1, at 152.

11. Plaintiff's overall rating was comprised of the ratings he was given in each of ten categories evaluated as part of the appraisal. Ex. 2, at ¶ 17; see also Ex. 10, at 3. Plaintiff received a "needs improvement" rating in only two of ten categories, one of which was the Communications category. Ex. 1, at 152; Ex. 2, at ¶ 17; Ex. 10, at 3, 4-5. Although Plaintiff contends that he should have received an "outstanding" rating in the Communications category in 2004, even if he had done so, his overall rating would have remained at the "fully acceptable" level. See Ex. 1, at 152-54; see also Ex. 10, at 3.

12. Neither Mr. Farrell nor anyone else at Pepco ever informed Plaintiff that he was disciplined because he had filed a charge. See Ex. 1, at 86, 135-36. In addition, no one at Pepco ever informed Plaintiff that he should not have filed the charge, nor did anyone try to prevent him from doing so. Ex. 1, at 86. Mr. Farrell's September 2 memorandum to Plaintiff regarding the DML does not mention Plaintiff's DCOHR charge. Id. at 150; see also Ex. 9.

13. There is no white Pepco employee who engaged in conduct similar to his own and who was not disciplined by Pepco. Ex. 1, at 146.

14. Plaintiff has never heard any of the individuals involved in the decision to issue him the DML – namely Mr. Farrell, Mr. Gausman, or Ms. Appuglies – make any racially disparaging statements, nor has he heard from anyone else at Pepco that any of these three people has ever made a racist comment. Ex. 1, at 148. Furthermore, Plaintiff cannot identify any instance in which his supervisor treated African-American employees any differently than other employees, and he has fully admitted that his view that Mr. Farrell is racist is based on nothing more than his "purely subjective" belief. See id. at 57-58.

Respectfully submitted,

_____/s/_____
William P. Flanagan (#419287)
Christine M. Burke (#492074)
HOGAN & HARTSON LLP
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
703-610-6100 (telephone)
703-610-6200 (facsimile)

Counsel for Defendant Potomac Electric Power Company

Of Counsel:

Jill D. Flack, Esq.
Associate General Counsel
Pepco Holdings, Inc.
701 Ninth Street, N.W., Suite 1100
Washington, D.C. 20068
202-872-2756 (telephone)
202-872-3281 (facsimile)

Dated: March 30, 2007