IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

PHILIP BROWNE                          :

          Plaintiff                    :

vs.                                    :   No. 1:05CV-01177

PEPCO                                  :

          Defendant                    :

- - - - - - - - - - - - - - - - x


                    January 30, 2007

                    Washington, D.C.

DEPOSITION OF:

                    PHILIP BROWNE

     was called for examination by counsel for the

Defendant, pursuant to notice, taken at Hogan &

Hartson, 555 13th Street, N.W., Washington, D.C.,

commencing at 10:15 a.m., before Misty Klapper, a

Notary Public in and for the District of Columbia,

when were present on behalf of the respective parties:

Page 14

1    Q.  Did you protest that internally?
2    A.  I did.
3    Q.  And what form did that protest take?
4    A.  It was just simply going to the internal
5 office and requesting, you know, as to why.  And they
6 indicated that because it was a one-year -- I think it
7 was like the District was like the federal government
8 at the time and they had to give no reason for it and
9 they didn't.
10   Q.  And was that the end of the matter?
11   A.  Yes, it was.
12   Q.  Did you claim when you went to them
13 internally that you were being mistreated or unfairly
14 treated because you're black?
15   A.  That was one of the claims.
16   Q.  What were the other claims?
17   A.  I don't remember the other claim.  It
18 would have been minor.
19   Q.  But the --
20   A.  The main claim was that -- yeah, that I
21 was a minority because my -- my -- my immediate
22 supervisor and his supervisor were -- were both

Page 15

1 Caucasian.
2    Q.  When was it that you were fired at WASUA?
3    A.  It would have been -- you know, I
4 don't -- it would have been 1981, somewhere around
5 there, maybe 1980.
6    Q.  So 25 years ago or so?
7    A.  (Nodding in the Affirmative.)
8    Q.  Have you ever brought any other claims
9 internally at a company claiming discrimination or
10 unfair treatment?
11   A.  No.
12   Q.  Have you ever been fired by any of your
13 employers, other than WASUA?
14   A.  No, I have not.
15   Q.  Have you ever been asked to resign by any
16 of your employers?
17   A.  No, I have not.
18   Q.  You were hired at PEPCO in about February
19 2001, correct?
20   A.  Yes, I was.
21   Q.  And what was the position you were hired
22 into?

Page 16

1    A.  It was called supervisor engineer
2 liaison.
3    Q.  Supervisor engineering liaison; is that
4 correct?
5    A.  Yes.
6    Q.  Was this in the distribution, engineering
7 and construction department?
8    A.  At the time it was called -- yes, yes,
9 distribution engineering -- distribution and
10 transmission engineering, I believe.
11   Q.  Reporting to Ken Farrell?
12   A.  No, it wasn't.  I was reporting to Dino
13 Basile.
14   Q.  When did you start reporting to Ken
15 Farrell?
16   A.  It could have been early -- around --
17 early 2004, late 2003.
18   Q.  Obviously, the supervisor engineering
19 liaison position was, in fact, a supervisory position,
20 correct?
21   A.  Yes, it was.
22   Q.  Do you know what the term exempt means?

Page 17

1    A.  Yes, I do.
2    Q.  And what is an exempt position?
3    A.  Management related position.
4    Q.  And your job at PEPCO was -- when you
5 were hired -- was a management position, correct?
6    A.  Yes, it was.
7    Q.  You were never a member of the union
8 representing PEPCO employees, correct?
9    A.  No, I was not.
10   Q.  And, in fact, from the time that you were
11 hired up until the present, you were always in a
12 supervisory position, correct?
13   A.  Yes, I have.
14   Q.  You were always in the same supervisory
15 position?
16   A.  Yes, I have been.
17   Q.  What is the role of a supervisor at
18 PEPCO?
19   A.  The role varies.
20   Q.  What was your role as a supervisor at
21 PEPCO?
22   A.  It was to supervise at the time there

Page 18

1 were -- I think there were six.
2    Q.  All bargaining unit employees?
3    A.  No, they were not.  There were one and it
4 varied depending on who was brought into the section
5 of supervisory from one to three exempt employees and
6 five, plus or minus one, I'm not sure, union
7 employees.
8    Q.  All right.  So the whole time you were at
9 PEPCO, you interviewed, give or take, about eight or
10 so -- I'm sorry, you supervised eight or so employees,
11 correct?
12    A.  Up until 11 of 2004.
13    Q.  Okay.  So from the beginning of your
14 hiring through 11 '04, you supervised a group of about
15 eight people, correct?
16    A.  Yes.
17    Q.  Some were exempt and some were nonexempt,
18 correct?
19    A.  Yes.
20    Q.  And the nonexempt employees were members
21 of the union, correct?
22    A.  Yes, they were.

Page 19

1    Q.  What did that mean for you that you had
2 to supervise these employees?  What did that involve?
3    A.  I'm not sure what -- what -- what you
4 mean.  I mean, there are job duties that were listed
5 that I was given and I exercised those duties.
6    Q.  Okay.  What were those supervisory duties
7 that you had from February '01 through about November
8 of '04?
9    A.  To oversee the work of these individuals
10 and to ensure that they performed the duties that were
11 listed under their respective job descriptions.
12    Q.  So you oversaw their work.  You made sure
13 they performed their duties.
14       Were you responsible for organizing the
15 work?
16    A.  In some cases, I was.
17    Q.  Were you responsible for discipline?
18    A.  Yes, I was.
19    Q.  Recommending discipline?
20    A.  Yes, I was.
21    Q.  And your recommendations were followed?
22    A.  For the most part.

Page 20

1    Q.  You were responsible for making sure that
2 your employees followed company policy?
3    A.  Yes, sir, I was.
4    Q.  You were responsible for making sure that
5 you understood what the policies were so that the
6 employees could understand them?
7    A.  Yes, I was.
8    Q.  Was it your responsibility to advocate
9 with your employees what the company's policy was?
10    A.  Yes, I did.
11    Q.  And that was your responsibility, right?
12    A.  Yes, it was.
13    Q.  Because that's the responsibility of a
14 supervisor, to make sure that the supervisor's
15 subordinates follow company policy, right?
16    A.  Yes, among other things.
17    Q.  Yeah, among all the other things,
18 assigning work and awarding discipline and scheduling,
19 you know, people when they're off work, those kinds of
20 duties, correct?
21    A.  Yes.
22    Q.  You understood, did you not, while you

Page 21

1 were working at PEPCO in a supervisory role that sort
2 of implementation of company policy with your
3 subordinates was an important part of your job, right?
4    A.  Yes.
5    Q.  Now, Mr. Browne, how did you learn how to
6 become a supervisor?
7    A.  I've been a supervisor from when I was
8 maybe 20, 22.
9    Q.  How old are you now?
10    A.  Fifty-seven.
11    Q.  As my dad used to like to say, this isn't
12 your first time at the rodeo, right?  You've been a
13 supervisor for a long time?
14    A.  Yes, I have.
15    Q.  For about 35 years?
16    A.  Yes, I have.
17    Q.  And would you say you sort of learned
18 about being a supervisor, in part, just based on the
19 experience that you had as a supervisor?
20    A.  I would agree with that, in addition to
21 training that was provided by individual employers at
22 various times.

| Page 22 | Page 24 |
|---|---|
| 1    Q.  So you got training by your employer, | 1  yourself over your years as a supervisor, you've still |
| 2  plus on-the-job learning about what it takes to manage | 2  implemented the company's policies, right? |
| 3  a work force, correct? | 3      A.  Yes, I have. |
| 4      A.  Yes, I did. | 4      Q.  Because you knew that the company's |
| 5      Q.  Of the last 35 years or so, roughly how | 5  policies were important? |
| 6  many of those years have you been a supervisor? | 6      A.  Yes. |
| 7      A.  Twenty, plus or minus. | 7      Q.  And you knew that your job as a |
| 8      Q.  Most of your career? | 8  supervisor for the company was to advocate and |
| 9      A.  I would -- well, you subtracted the | 9  implement the policies of the company, not the |
| 10  time -- the times I was in college, various colleges. | 10  policies of Phil Browne, right? |
| 11     Q.  Since college most of your working years | 11     A.  You're absolutely correct. |
| 12  have been as a supervisor, right? | 12     Q.  Now, Mr. Browne, and I mean this with all |
| 13     A.  Yes, or in management. | 13  due respect, you've said that you've learned how to be |
| 14     Q.  Do you think you're a good supervisor? | 14  a supervisor with 35 years of experience. |
| 15     A.  I believe I am. | 15     A.  Yes. |
| 16     Q.  By the way, when you have supervised | 16     Q.  And you've learned about being a |
| 17  these employees for the past, you know, 20 of the last | 17  supervisor, in part, based on what you've learned at |
| 18  35 years, did you ever have occasion to disagree with | 18  the job and training courses, right? |
| 19  your employer's policies? | 19     A.  Yes, I have. |
| 20     A.  Yes, I have. | 20     Q.  Now, I take it you can't point for me or |
| 21     Q.  I mean, have there been times when you | 21  point to me -- strike that. |
| 22  said, you know, if this was my company or I was in | 22         I take it you can't point me to a manual |

| Page 23 | Page 25 |
|---|---|
| 1  charge here, we just wouldn't have that policy? | 1  or a book that says this is what you've got to do if |
| 2      A.  I have not said that. | 2  you want to be a good supervisor? |
| 3      Q.  Have you said that to yourself ever? | 3      A.  There are manuals that exist.  And when I |
| 4      A.  I don't know if I've said it to myself. | 4  was at the Washington Suburban Sanitary Commission, |
| 5  I just look at a policy and evaluate it based on my | 5  which I -- you -- as -- as you became a supervisor, |
| 6  personal and religious belief. | 6  before you even supervise anybody, you're required to |
| 7      Q.  And there have been some times when | 7  take -- |
| 8  you've said to yourself something to the effect of if | 8      Q.  A class and a manual or take a class? |
| 9  this was my company, we wouldn't have this particular | 9      A.  A one-week class. |
| 10  policy? | 10     Q.  And you get handouts and manuals and so |
| 11     A.  I don't think I would have said that.  I | 11  forth that gives you some instructions, right? |
| 12  would have said well -- | 12     A.  Yes. |
| 13     Q.  I'm talking about you said to yourself. | 13     Q.  But everything you've learned in your |
| 14  When you're thinking at your own desk -- | 14  last 35 years about being a good manager and a good |
| 15     A.  Yeah. | 15  supervisor, that's not in a manual someplace, is it? |
| 16     Q.  -- there have been times when you've said | 16     A.  Some of it is not, no. |
| 17  over the years, you know, if I was in charge of this | 17     Q.  Some of it is not, right? |
| 18  company and if these were the policies that I had to | 18     A.  Yeah, some of it is not. |
| 19  put in place, we wouldn't have this particular policy; | 19     Q.  As a matter of fact, at PEPCO it was the |
| 20  you've said that, right? | 20  same situation, right, that there were certain stated |
| 21     A.  Yes, I have. | 21  written policies, but some of the things you needed to |
| 22     Q.  But even though you've said that to | 22  know to be a good manager, they weren't in written |

Page 26

1 policies, right?
2    A. I wouldn't agree with that. They --
3 for -- for the most part, most of what you were
4 required to administer at PEPCO were written.
5    Q. But there were some things that weren't
6 written, right?
7    A. That's -- that's a difficult one in the
8 sense that -- that the ones that -- I -- I don't -- I
9 don't really subscribe to the fact that -- that --
10 that the things that they want you specifically to do
11 that was important to the firm was not necessarily
12 written.
13    Q. Well, you would agree with me, would you
14 not, that it's important -- it's an important quality
15 of a supervisor that he not ignore his employees all
16 day long, right? You would say that it would be
17 important for you to be a good manager for when your
18 assistant comes in every day, it would be important
19 for you not to ignore her all day long, right?
20    A. Yes, you're correct.
21    Q. It's bad management to every day ignore
22 him, he talks to you, she talks to you, ignore,

Page 27

1 ignore, ignore; that's bad management, right?
2    A. Yes, it is.
3    Q. Is not ignoring employees something
4 that's written in a policy at PEPCO?
5    A. I don't recall seeing anything that you
6 shouldn't ignore them.
7    Q. Right. But you knew, even though it
8 wasn't written down, that that's something you
9 shouldn't do because it's bad management, right?
10    A. Yes.
11    Q. How about making your subordinates at
12 PEPCO communicate with you only by -- only in writing,
13 would that be bad management?
14    A. Not necessarily.
15    Q. It might be good management?
16    A. If it -- if it -- in a case where -- I
17 mean, there are some cases where that may be necessary
18 based on if an incident or incidents develop.
19    Q. Can you point to a policy at PEPCO which
20 says it's okay to ignore employees?
21    A. No, that wasn't the question you asked
22 before.

Page 28

1    Q. Well, can you point to a policy that says
2 it's okay to ignore employees?
3    A. No, I cannot.
4    Q. Well, if there's not a policy at PEPCO
5 that allows you to do it, how do you know you're
6 allowed to do it?
7    A. To ignore employees?
8    Q. Yes. You said in some situations it's
9 okay to ignore employees.
10    A. No, that's not what I was responding to.
11 You said in some cases you had to write something and
12 I says --
13    Q. Okay. Let's strike that. I gave you a
14 different example.
15    You said in some situations it's okay as
16 a manager to require his subordinate to communicate
17 with the manager only in writing, right? You said
18 that might be a good management tool?
19    A. On occasions if it is a situation between
20 you and an employee where words seem never to be
21 acknowledged with each other, then it may be
22 desirable, and to protect each other for a time, to

Page 29

1 then communicate in writing.
2    Q. Okay. Now, Mr. Browne, can you point me
3 to a PEPCO policy that says in writing that as a
4 manager, you're allowed to institute a policy or a
5 practice with a given employee that says that employee
6 can only communicate with you, the manager, in
7 writing? There's not a policy like that, is there?
8    A. No, there's not.
9    Q. And even though there's not a policy
10 about that, you know that there are times when it
11 might be okay for you to institute this kind of
12 practice with respect to a certain employee, right?
13    A. Yes.
14    Q. And the reason you know that is because
15 there are a lot of things and characteristics of being
16 a manager that aren't written down in some policy
17 someplace, but it's in your head, right?
18    A. Yes.
19    Q. Because you've learned it from your 35
20 years of experience?
21    A. Yes.
22    Q. So just because something is not in a

Page 30

1 policy doesn't mean it's okay to do it, right? Let me
2 strike that. It's confusing.
3    A. Yes, it is.
4    Q. Just because there's not a specific
5 policy that says you, Mr. Supervisor, cannot do this,
6 doesn't mean it's okay to do it, right?
7    A. I would answer that in the same, it
8 depends on -- on the nature of the instruction. If --
9 if an instruction is a significant instruction, I
10 honestly believe that there should be managerial
11 direction for that -- you know -- for that
12 instruction. So I don't necessarily agree with your
13 comment.
14    Q. And the instruction has to be in writing?
15    A. I would agree with that, yes.
16    Q. Who decides whether something is so
17 important of an issue that it's got to be put in
18 writing?
19    A. I think upper management does that.
20    Q. Not the first line supervisor, right?
21 It's upper management's determination?
22    A. I would agree with that statement, yes.

Page 31

1    Q. Mr. Browne, I want to ask you some
2 questions about when you were the supervisor liaison
3 from 2001 to 11 '04.
4    I take it during that time you had
5 occasion to read and learn about PEPCO's policies that
6 affected its workers, right?
7    A. Yes, I did.
8    Q. And it was important for you to do it,
9 right?
10    A. Yes, I did.
11    Q. And you knew that these policies, many of
12 them were on-line, right?
13    A. Yes.
14    Q. And you read the ones that affected your
15 employees?
16    A. Yes.
17    Q. And it was important for you to read
18 them, right?
19    A. Yes.
20    Q. Because you knew that as a supervisor at
21 PEPCO, a central part of your job was to be aware of
22 these policies, right?

Page 32

1    A. Yes.
2    Q. You told me a couple of minutes ago that
3 this was not the first -- that your job at PEPCO was
4 not the first time that you were supervisor, because
5 you've been a supervisor for about 20 of the last 35
6 years.
7    It's also not the first time that you
8 worked in a union environment, is it?
9    A. No, it's not.
10    Q. You've worked in a union environment many
11 other times, right?
12    A. Yes, I have.
13    Q. And you've been a supervisor in
14 workplaces where there was a union environment, right?
15    A. Yes, I have. I was.
16    Q. And you're aware, are you not, that union
17 members actually have an opportunity to bargain for
18 their terms and conditions of employment?
19    A. Yes, I am aware of that.
20    Q. And you're also aware that management in
21 these work environments assigns or puts people on the
22 case of negotiating on the company's behalf with the

Page 33

1 union, correct?
2    A. Yes, I'm aware of that.
3    Q. What happened in November of '04 that you
4 were no longer the supervisor liaison?
5    A. Upper management saw fit to dissolve the
6 section in which I worked. And they created two other
7 sections and I was assigned to one of those.
8    Q. Okay. So what's the name of your
9 section?
10    A. Distribution engineering.
11    Q. Okay.
12    A. District of Columbia.
13    Q. And so there was a restructuring of some
14 sort, a reorganization?
15    A. That's what it was claimed to be.
16    Q. Okay. Do you believe it was a
17 reorganization?
18    A. It was -- it was a reorganization.
19    Q. Okay. It was a reorganization?
20    A. Yes.
21    Q. And you believed that the reorganization
22 was done for legitimate business reasons, that

**Page 54**

1  that was there.

2     Q. Anything else?

3     A. No, I was just responding to your

4  question.

5     Q. Was there anything else that led you to

6  conclude that you were more qualified for these

7  positions than the three people who got them?

8     A. No. I gave you my answer.

9     Q. Are you aware that under PEPCO policy,

10  the existence of a DML in an exempt employee's file

11  does not disqualify the exempt employee from seeking

12  and being promoted to another position?

13     A. Could you repeat your question?

14       MR. FLANAGAN: Can you read it back?

15       (The record was read as requested.)

16       THE WITNESS: I believe -- yes and no.

17       BY MR. FLANAGAN:

18     Q. What do you mean by that?

19     A. I believe that the DML does not

20  disqualify you from seeking the position; however, I

21  do believe that PEPCO's unwritten policy does -- does

22  prevent a person from -- from getting the position.

**Page 55**

1     Q. And again, just so I'm clear, you've

2  never seen that written anywhere and nobody has ever

3  told you that that's the policy?

4     A. No, I have not.

5     Q. When did you move from Benning to Edison

6  Place?

7     A. April of last year.

8     Q. Do you believe that you were given the

9  DML because you're black?

10     A. In part, I was.

11     Q. Why do you say that?

12     A. I say that because I think that this

13  firm -- and I --

14     Q. By this firm you're talking about PEPCO?

15     A. Yes.

16       -- pays lip service to equal treatment

17  with respect to minorities.

18     Q. Anything else that led you to believe

19  that the DML was, in part, because you're black?

20     A. Because of my relationship or lack

21  thereof with Mr. Farrell.

22     Q. Do you think he's biased against blacks?

**Page 56**

1     A. Yes, at the time.

2     Q. At what time?

3     A. During the time that he supervised me.

4     Q. So today you think that during the time

5  that he supervised you he was racist?

6     A. I didn't understand the question.

7     Q. So you think that during the time that he

8  supervised you he was biased against blacks, right?

9     A. To an extent, yes.

10     Q. How did that bias manifest itself?

11     A. In the way that he treated -- at least

12  that I believe that he treated us differently than

13  others in terms of assignments.

14     Q. In terms of assignments?

15     A. Yes.

16     Q. How else did he treat you differently?

17     A. I think the yardstick which he used for

18  us was different from the others.

19     Q. What do you mean by that?

20     A. In terms of how he managed us.

21     Q. How did he manage you differently than

22  white employees?

**Page 57**

1     A. I believe that he demanded less of the

2  others.

3     Q. The whites?

4     A. Yes.

5     Q. Give me an example of how he demanded

6  less of whites.

7     A. Well, there were two black supervisors

8  and one, at least in my, you know, estimation is not a

9  strong verbal oral type like I am.

10     Q. So the other -- the other black is not as

11  strong as you are?

12     A. In my estimation.

13     Q. What does that have to do with your

14  statement that Mr. Farrell demanded less of whites?

15     A. And I think we were given assignments

16  that entailed a lot more stuff to do or material to

17  collect and do than -- than he did the others.

18     Q. Can you identify any specific situation

19  where he demanded more of you than of white employees?

20     A. My -- my -- like I says, my estimation is

21  purely subjective and, therefore, it would not

22  necessarily come with specific examples.

Page 58

1    Q. So you just believe -- you believe that
2 he's racist, but you don't have any examples of that?
3    A. No, I says he was at the time. I felt
4 that he treated us differently. That's what I said.
5    Q. So you felt at the time that he treated
6 blacks differently, but you can't identify any
7 situations or examples of treating blacks differently?
8    A. I can't recall specific examples right
9 now.
10    Q. And the reason is because this was just
11 your subjective hunch that he treated you differently,
12 right?
13    A. Yes.
14    Q. Did Mr. Farrell ever tell you that he was
15 going to treat you differently because you're black?
16    A. No, he's never said that.
17    Q. Did he ever say that he was going to
18 treat anybody else differently because they're black?
19    A. No, he's never said that.
20    Q. Did he ever make any racially disparaging
21 statements of any kind?
22    A. I'm trying to recall some and I can't

Page 59

1 pinpoint one right now.
2    Q. You're a pretty sophisticated guy.
3 You've been in the work force for 30 something years.
4 If he had made a racist statement to you, you'd
5 remember it, right?
6    A. He made comments that were not -- I mean,
7 that some people may interpret as being, you know,
8 different. And, like I says, since I don't have the
9 specific examples, I'm going to leave it that they
10 were just a pure subjective comment on my part.
11    Q. You can't recall any specific racist
12 statement that he ever made, right?
13    A. No.
14    Q. And you can't identify anybody else who
15 has ever told you that Mr. Farrell made a racist
16 statement, right?
17    A. Yes.
18    Q. Who?
19    A. Renee.
20    Q. Renee Carter-Moton?
21    A. Yes.
22    Q. What did she say Farrell said?

Page 60

1    A. Well, she just believed that he treated
2 us differently too.
3    Q. Did Renee Carter-Moton ever tell you that
4 Mr. Farrell had made a racially disparaging statement?
5    A. I -- I can't recall the specific time,
6 but I just remember the conversation with her to that
7 effect, that she felt that we were being treated
8 differently.
9    Q. She said she felt you were being treated
10 differently, but she didn't tell you ever that
11 Mr. Farrell had made a racially disparaging statement
12 about blacks, did she?
13    A. No.
14    Q. And she didn't tell you how she thought
15 Farrell was treating blacks differently than whites,
16 did she?
17    A. I -- what --
18    Q. Well, you told me a couple of minutes ago
19 that in some conversation Renee told you that she
20 thought Farrell treated blacks differently than
21 whites, right?
22    A. Um-hmm (affirmative).

Page 61

1    Q. Did she give you an example at the time?
2    A. I don't -- I don't -- to be honest with
3 you, I don't -- I don't recall. I just remember the
4 conversation. I don't recall if it was a specific
5 incident that she was referring to.
6    Q. You said the management had it in for you
7 as a result of the DML.
8    A. Yes.
9    Q. Did management have it in for you, using
10 your words, for any reasons other than the DML?
11    A. Well, what led up to the DML was -- was I
12 had requested responses to several issues that had
13 come up and one was directly to Mr. Farrell. I had
14 wanted to take a legal assistant class with GW and I
15 was going to apply through the PEPCO employee
16 assistance system.
17    The form -- on the form -- on the form it
18 lists at the bottom that you are supposed to inform
19 your supervisor and your supervisor was supposed to
20 initial it. I was -- I registered for the class and I
21 sent through those forms to Mr. Farrell. And
22 Mr. Farrell wrote back that he -- he's not -- he's not

Page 62

1 inclined to sign the form because he didn't think that
2 taking the class would be any relevance to my job.
3        And I only discovered after that that a
4 supervisor really doesn't authorize or, rather, he's
5 not inclined to authorize -- he's not inclined to
6 authorize me taking the class.
7    Q. What are you reading from?
8    A. I'm not reading from anything.
9    Q. What do you have in front of you?
10    A. This is a weekly report I sent to
11 Mr. Farrell.
12    Q. At the break I want to make a copy of all
13 the documents you brought with you.
14        Are those documents relating to PEPCO?
15    A. Yes, they are.
16    Q. Are they relating to this case?
17    A. To some extent, they are.
18    Q. Have you turned them over in response to
19 discovery requests?
20    A. This would have been turned over, yeah.
21    Q. And I would like to take a look at it at
22 the break, just to make sure it's stuff we already

Page 63

1 had.
2    A. I wasn't reading from it.
3    Q. Okay.
4    A. I was going from my memory. And I was
5 saying specifically that -- that I realize that --
6 that the -- that the form -- the supervisor was only
7 to initial the form and not to approve or disapprove
8 the class.
9    Q. Did you ever follow up on this trying to
10 get your tuition paid for?
11    A. No, I just left it alone.
12    Q. And you said this led up to the DML?
13    A. No, that's just one of the five issues
14 that I wrote to -- I wrote -- I wrote to HR on five
15 issues, which they never responded.
16    Q. Okay.
17    A. That was one of the issues. Another of
18 the issue was --
19    Q. I want to know -- the question was --
20    A. Okay.
21    Q. -- what issues led up to the DML.
22    A. The issues that I was told that led up to

Page 64

1 the DML were an issue dealing with parking at Benning.
2 That was one issue.
3        And the second, their issue was my
4 communication with the union relative to Mr. -- Mr. --
5 I think it was the -- the VP.
6    Q. All right. Any other issues that led up
7 to the DML?
8    A. No, those were the two issues.
9    Q. Okay. Now, I had asked you a question
10 about reasons other than the DML that caused the
11 company to be out to get you.
12    A. And that's the one I was just relaying to
13 you.
14    Q. And you were talking about these two
15 issues that led up to the --
16    A. No, the two issues that I was issued the
17 DML were the ones on parking and communication with
18 the union. You asked me if there were issues other
19 than that that I thought the company had it in for me
20 and I was relating to you one of the issues that I
21 believe was -- it was relevant because it dealt
22 direct -- it was Mr. Farrell.

Page 65

1    Q. These were issues that you brought to the
2 attention of the human resources department, correct?
3    A. I brought the issue of the -- the
4 response to the training to human resources.
5    Q. Okay. And you did that in writing,
6 right?
7    A. Yes, I did.
8    Q. And it was about March of '04, right?
9    A. Something like that, yes.
10    Q. And it was a letter that you had sent to
11 PEPCO, correct?
12    A. Yes.
13    Q. And it identified several issues that
14 were on your mind then, right?
15    A. Yes.
16    Q. And is it your contention in this case
17 that that letter to human resources was part of what
18 led management to, in your words, be out to get you?
19    A. Yes.
20    Q. Anything else that led management to be
21 out to get you?
22    A. No, not that I can think of.

Page 66

1    Q.  With respect to that issue, Mr. Browne,
2  over the last several years since you got your DML --
3    A.  Yes.
4    Q.  -- have you received annual pay
5  increases?
6    A.  Yes, I have.
7    Q.  As a matter of fact, you received a pay
8  increase in March of '05, correct?
9    A.  Yes.
10    Q.  And you received a special incentive
11  payment for exempt employees in April '05, right?
12    A.  Yes, I did.
13    Q.  There's never been a time since you got
14  the DML when you were eligible for a pay merit
15  increase and didn't get one, has there been?
16    A.  No.
17    Q.  Since you filed the -- I'm sorry, since
18  you received the DML in summer of '04, you received
19  performance appraisals, correct?
20    A.  Yes.
21    Q.  And your performance appraisal in each
22  case that you've received one has been at least at the

Page 67

1  fully acceptable overall level, correct?
2    A.  Yes.
3    Q.  And this fully acceptable overall level
4  that you've received since the DML is the same fully
5  acceptable that you received before the DML, right?
6    A.  Yes.
7    Q.  In fact, you've always gotten fully
8  acceptable ratings, right?
9    A.  Yes.
10    Q.  Since the DML, you were never demoted,
11  right?
12    A.  No.
13    Q.  You were never suspended?
14    A.  No.
15    Q.  You were never fired?
16    A.  No.
17    Q.  You never received any discipline of any
18  kind since the DML was issued, right?
19    A.  No.
20    Q.  That's not right?  Have you ever been
21  disciplined since the DML?
22    A.  No, I have not.

Page 68

1    Q.  So you haven't gotten any discipline,
2  correct?
3    A.  I have not.
4    Q.  And as a matter of fact, the DML that was
5  in your file expired, by its terms, 18 months after it
6  was issued in July of '04, correct?
7    A.  I don't know.  I was never -- I was never
8  told that it was.  I was -- I just simply -- in fact,
9  I asked my attorney to -- if I was supposed to receive
10  a letter.
11    Q.  You understood, did you not, because
12  you're a supervisor and you've read all of PEPCO's
13  policies, that the DML lasted for 18 months, right?
14    A.  I understood that.
15    Q.  And you knew that after 18 months, it was
16  supposed to be expired, right?
17    A.  I believe that it should have been.
18    Q.  And you knew at the time that you got the
19  DML back in the summer of '04, because management told
20  you, that this thing would expire in 18 months, right?
21    A.  That's what was told to me, yes.
22    Q.  And so according to that math, this thing

Page 69

1  should have expired in January of '06, right?
2    A.  Yes.
3    Q.  Nobody told you that it didn't expire,
4  right?
5    A.  I was expecting -- no, to answer your
6  question.  I was expecting to get official
7  certification from HR that it was.
8    Q.  What led you to think you were going to
9  get official notification?
10    A.  I just says that I believe I should get
11  it, that I should have gotten it.  It is something
12  that is normally done with bargaining unit people.  I
13  was made to understand that that's normally done with
14  bargaining people.
15        And as I told you earlier, my belief is
16  that the firm mirrors the same things, even though
17  mostly unwritten, that they -- that they do for
18  bargaining unit with exempt people.
19    Q.  In January of '06 when 18 months expired,
20  18 months of the DML came and went, did you go to
21  anybody at PEPCO and say hey, what gives with this
22  DML, has it expired?

## Page 70

1  A.  I don't remember if I did, other than
2  bring it to my attorney's attention.  That I don't
3  remember receiving.
4  Q.  So you don't recall sending a letter to
5  anybody, asking any of your supervisors, asking HR,
6  asking anybody whether, in fact, this thing has
7  expired?
8  A.  No, I -- I did not want to involve my
9  immediate manager since he wasn't my manager, you
10 know, and I left it there.
11 Q.  You didn't call anybody up in PEPCO's
12 legal office to figure out whether or not it expired,
13 right?
14 A.  No, I did not.
15 Q.  Would it surprise you to know that, in
16 fact, this thing has been expired for a full year?
17 A.  No, it wouldn't surprise me.
18 Q.  Mr. Browne, you recently submitted your
19 letter of resignation, right?
20 A.  Yes.
21 Q.  When is your last day?
22 A.  My last day officially -- I don't

## Page 71

1  remember -- March sometime, because I have 35 days.
2  Q.  I'm sorry?
3  A.  The official -- my physical last day is
4  Friday.  The substantive date would be at the end of
5  the vacation, which I am entitled to.
6  Q.  Okay.  So you've got some accrued
7  vacation that you're going to use?
8  A.  Yes.
9  Q.  But your last day of actual work is this
10 Friday?
11 A.  Yes.
12 Q.  And then you'll be paid out through some
13 date in March; is that right?
14 A.  Yes, I've requested that.
15 Q.  And when did you resign?
16 A.  I gave two weeks, which would have been
17 last Monday.
18 Q.  And you resigned to accept another job?
19 A.  You --
20 Q.  You're going to go work someplace else,
21 right?
22 A.  Yes.

## Page 72

1  Q.  Where are you going to work?
2  A.  I don't think that you --
3  Q.  It is relevant, actually.  You have to
4  answer the question.  Where are you going to work?
5  MR. CLAIR:  I object to that.  He doesn't
6  have to answer the question.  He can give a reason why
7  he doesn't want to, but he doesn't have to answer the
8  question.
9  BY MR. FLANAGAN:
10 Q.  Are you refusing to answer this question?
11 A.  I'm --
12 MR. FLANAGAN:  Because if you're refusing
13 to answer the question, Mr. Clair, we'll get the judge
14 on the line at the break.
15 (Thereupon, the witness and his
16 counsel conferred.)
17 THE WITNESS:  I will not answer the
18 question.
19 BY MR. FLANAGAN:
20 Q.  You will not answer the question where
21 you are going to work?
22 A.  No.

## Page 73

1  Q.  Is it in the District of Columbia?
2  A.  I will not answer that question either.
3  Q.  Is it a supervisory position?
4  (Thereupon, the witness and his counsel
5  conferred.)
6  THE WITNESS:  Yes, it is.
7  BY MR. FLANAGAN:
8  Q.  How much are you going to be paid in the
9  new position?
10 A.  I refuse to answer that question.
11 Q.  On what basis are you refusing to answer
12 it?
13 A.  Because of relevance.
14 Q.  Is the position that you are going to
15 take, a position for which you have a top secret or a
16 higher clearance?
17 A.  No, it's not.
18 Q.  Have you told anybody about where you're
19 going to work?
20 A.  I've told my confidante.
21 Q.  Which is who?
22 A.  John Keiller.  His name was brought up

Page 74

1 before.
2      MR. FLANAGAN: Mr. Clair, he's got an
3 obligation to answer these questions. There's no
4 reason why he shouldn't answer them.
5      (Thereupon, the witness and his
6 counsel conferred.)
7      THE WITNESS: I do not want to disclose
8 where I will work because I fear retaliation from my
9 present employer, as I believe that they have
10 retaliated against me in the past.
11      MR. FLANAGAN: Let the record reflect
12 that that answer was given after a consultation with
13 his lawyer.
14      BY MR. FLANAGAN:
15      Q. What are you worried that PEPCO is going
16 to do?
17      A. I -- I honestly believe that PEPCO has,
18 for lack of a better term, tentacles.
19      Q. And what do you believe that PEPCO is
20 going to do?
21      A. And those tentacles reach far and wide,
22 particularly within this environment. And I fear that

Page 75

1 PEPCO's upper managers, as a continuation of
2 retaliation towards me, will speak ill or in some way
3 try to make life difficult for me with my new
4 employer.
5      Q. Who do you think at PEPCO is going to do
6 that?
7      A. For one, my immediate manager.
8      Q. Who?
9      A. Joe Schall.
10      Q. You think Joe Schall is going to make
11 life difficult for you; is that right?
12      A. Yes, I believe that.
13      Q. And who else do you think is going to
14 make life difficult for you?
15      A. Any -- any agent of his or any person,
16 Mr. -- Mr. Farrell -- not Farrell, Mr. Gausman.
17      Q. What's your basis for refusing to answer
18 my question about how much money you're going to make
19 in your new job?
20      A. I don't think it is relevant to --
21      Q. Are you seeking damages in this case?
22      A. You mean from --

Page 76

1      Q. Are you seeking money from my client,
2 PEPCO?
3      A. Yes, I am.
4      Q. Okay. Then it is relevant. So you're
5 refusing to answer this based on relevance, is that
6 clear, a fair clarification?
7      (Thereupon, the witness and his counsel
8 conferred.)
9      MR. FLANAGAN: Let the record reflect
10 that I put a question on the table and he's consulted
11 with his lawyer. Now he may answer it.
12      THE WITNESS: I'm making $90,000 a year.
13      BY MR. FLANAGAN:
14      Q. With benefits?
15      A. Yes.
16      Q. Did you have that position -- had it been
17 offered to you prior to the time that you submitted
18 your resignation?
19      A. Yes.
20      Q. When did you get the offer?
21      A. The offer was verbally made on Wednesday,
22 the week before I gave the -- the notice.

Page 77

1      Q. And your resignation from PEPCO is
2 completely voluntary; isn't that the case?
3      A. Yes, it is.
4      Q. Nobody told you you had to resign?
5      A. No, nobody told me to resign.
6      Q. As a matter of fact, you quit the job
7 because this was a good opportunity and a higher
8 paying job at your new job, right?
9      A. I believe so, yes.
10      MR. FLANAGAN: Can we take ten minutes?
11      (Thereupon, a brief recess was taken.)
12      BY MR. FLANAGAN:
13      Q. I just remind you that we remain on the
14 record.
15      Mr. Browne, I want to ask you some
16 questions about the lawsuit that you filed against
17 PEPCO, which is the Complaint in this case.
18      You've read the Complaint, right?
19      A. Um-hmm (affirmative).
20      Q. Is that yes?
21      A. Yes, I have.
22      Q. And you read it before it was filed in

Page 86

1    Q. Did anybody ever tell you that you should
2 not have gone to the DCOHR, but handled that inside?
3    A. Nobody said that officially, no.
4    Q. PEPCO said it unofficially at PEPCO,
5 have they?
6    A. None of the managers.
7    Q. And none of the managers at PEPCO have
8 ever tried to prevent you from filing your charge with
9 DCOHR, right?
10    A. No, they haven't prevented me from doing
11 it.
12    Q. And nobody ever told you that you were
13 getting a DML because of the DCOHR, right, because of
14 the DCOHR complaint? Nobody ever told you that,
15 right?
16    A. No.
17    Q. Okay. So why is it that you think that
18 you got a DML because you had gone to the DCOHR?
19    A. Because of the players involved.
20    Q. Which players?
21    A. The people who were assembled to give me
22 the DML were Mr. Farrell, Miss Appuglies and the vice

Page 87

1 president.
2    Q. Mr. Gausman?
3    A. Mr. Gausman. And they were the very
4 players, individually or collectively, to which the
5 previous issues were addressed to.
6    Q. What did any of those people or anybody
7 else at PEPCO do that led you to conclude that you
8 were getting a DML because you had gone to the DCOHR?
9    A. Because reference was made to it.
10    Q. And what was the reference that was made?
11    A. As I said, Mr. Farrell did acknowledge
12 that he knew that the case was filed.
13    Q. Right. So is it your -- is it your
14 contention that once the case was filed, PEPCO was
15 never allowed to discipline you for anything?
16    A. My understanding is yes, that they should
17 not be.
18    Q. There shouldn't be any discipline for
19 anything once you file a charge with the DCOHR?
20    A. That was my understanding of -- of that,
21 that I should not -- that I should not be disciplined
22 for -- I mean, once the case has been filed.

Page 88

1    Q. So the way that you understand it, once
2 you filed that case at DCOHR, you could have done
3 anything and PEPCO couldn't have disciplined you?
4    A. I wouldn't agree with that comment, no.
5 I believe if I had participated in an activity that
6 was egregious to the firm, then I believe that the
7 firm would have had a right to do that.
8    Q. Who decides what's egregious, you or
9 senior management?
10    A. I believe senior management would.
11    Q. It's senior management's call, right --
12    A. Yes.
13    Q. -- as to whether or not discipline is
14 appropriate?
15    A. Yes.
16    Q. So if you filed your DCOHR charge and
17 then just decided I'm not coming back to work and
18 disappeared for 30 days, could they discipline you in
19 that situation?
20    A. Yes, because I think that's egregious.
21    Q. If you had filed your DCOHR complaint and
22 then were insubordinate to your supervisor, could they

Page 89

1 have disciplined you in that situation?
2    A. Well, insubordinate to the -- to the --
3 insubordinate if it is -- if there are specific
4 written documentation that -- that -- that I had
5 violated or any violation of that insubordination was
6 there.
7    Q. You'd agree with me that there are
8 certain types of insubordination that you could have
9 done after the DCOHR charge and they could have
10 disciplined you, right?
11    A. To an extent, yes.
12    Q. How about ignoring a direct order of the
13 vice president, could they discipline you for that?
14    A. I did not believe that.
15    Q. If you had done that, could they have
16 disciplined you for that?
17    A. I didn't --
18    Q. If you had disregarded an order of the
19 vice president, could they have disciplined you for
20 that?
21    A. The -- there again, that's -- that's
22 interpretation. I did not interpret that -- that I

Page 90

1 had disobeyed an order from a vice president.
2    Q.  Okay.  Other than the fact that
3 Mr. Farrell had acknowledged that you had filed a
4 charge with the DCOHR, was there anything else that
5 led you to conclude that you were getting that DMR
6 because you had file the DCOHR complaint -- DML, I'm
7 sorry?
8    A.  No.
9    Q.  Do you think that PEPCO made up the
10 reasons why they gave you the DML?
11    A.  Yes.
12    Q.  They're made up?
13    A.  Yes.
14    Q.  They didn't happen?
15    A.  I think their interpretation of it is
16 different to what mine is and I think interpretation
17 is subjective.
18    Q.  Do you think they made it up?
19    A.  Yes.
20    Q.  Do you think they lied?
21    A.  I didn't say they lied.  I think their
22 interpretation of the reason they gave was different

Page 91

1 to what I interpreted.
2    Q.  I want to know what you mean when you say
3 PEPCO made up the reason why it gave you a DML.
4       Do you mean they were lying?
5    A.  If you want the literal interpretation of
6 it, yes.
7    Q.  Okay.  So you believe that they said you
8 did something that you didn't do?
9    A.  No, I think their interpretation of what
10 I did was incorrect.
11    Q.  Was it intentionally false on their part?
12    A.  Yes.
13    Q.  Tell me again what the two issues were in
14 the DML.
15    A.  The issue, as I interpreted it, was
16 related to parking.  They were parking and
17 communication with the union.
18    Q.  What was the issue that was raised in the
19 DML with respect to parking?
20    A.  Parking, as far as I was aware, was when
21 there are, I think, rules that were established by --
22 and I'm trying to remember who established those

Page 92

1 rules, but at Benning, as far as parking at Benning
2 was concerned.
3    Q.  And were rules issued with respect to
4 parking at Benning?
5    A.  The rules were issued or reissued and
6 were not necessarily followed.
7    Q.  Okay.  When were the rules reissued?
8    A.  They were reissued in -- I believe in
9 early -- sometime in 2004.
10    Q.  And who issued the rules?
11    A.  The rules were issued by the holder of
12 the -- Ted Karnezis.
13    Q.  Who is Ted Karnezis?
14    A.  Ted Karnezis is the holder of the
15 position which I had -- one of the -- one of the
16 issues I had initiated in my complaint against PEPCO.
17    Q.  And what were the rules with respect to
18 parking?
19    A.  The rules were that there were specific
20 areas that were designated for exempt employees and
21 places to park for bargain unit employees.
22    Q.  And the rules that were issued with

Page 93

1 respect to parking for exempt and nonexempt in 2004,
2 that was a reminder of rules that had been in place
3 for some time, wasn't it?
4    A.  That's what I was told.
5    Q.  And you understood that to be the case,
6 right?  You knew those rules had been in place for
7 some time?
8    A.  I was not aware that those rules were in
9 place for some period of time.
10    Q.  But, in fact, you were told that the
11 rules were a reminder of some existing rules, right?
12    A.  Yes.  Evidently the rules were not being
13 enforced or followed and, therefore, my interpretation
14 of it was that there were no rules.
15    Q.  And then once it came to your attention
16 that the rules were being reissued, you also realized
17 at the same time the rules were being reissued to
18 other supervisors, right?
19    A.  Yes.
20    Q.  As a matter of fact, you knew that these
21 rules were being issued at Benning across the board
22 for people who parked near builder 59, right?

## Page 94

1   A. Yes.

2   Q. As a matter of fact, the rules were

3 reissued to Robert Brown, right?

4   A. Yes.

5   Q. And they were reissued to Mr. Saba,

6 right?

7   A. Yes.

8   Q. And they were reissued to Mr. Dudley,

9 right?

10   A. Yes.

11   Q. And they were reissued to others, right?

12   A. Yes.

13   Q. And you knew that all of the supervisors

14 were charged with making sure that exempt and

15 nonexempt employees parked in the correct spaces,

16 right?

17   A. Yes.

18   Q. And you knew that this rule was being

19 issued without regard to race, right? It applied to

20 everybody, whether you're black or you're white,

21 right?

22   A. Yes.

## Page 95

1   Q. And you disagreed with that rule, didn't

2 you?

3   A. Yes.

4   Q. And you made your disagreement known to

5 management, right?

6   A. Yes.

7   Q. And as a matter of fact, after you were

8 told to make sure that your subordinates followed the

9 rules, you protested that, right?

10   A. Yes.

11   Q. And you said you didn't like the rule,

12 right?

13   A. Yes.

14   Q. And you delayed in making sure that your

15 subordinates followed the parking rule, right?

16   A. I did what?

17   Q. You delayed.

18   A. Yes.

19   Q. You put up a fuss, right? You didn't

20 like it?

21   A. Yes.

22   Q. And as a matter of fact, after you were

## Page 96

1 finally told by not only Karnezis, but also

2 Mr. Farrell, you ultimately relented and instructed

3 your subordinates to follow the parking rule, right?

4   A. Yes.

5   Q. But even when you told your subordinates

6 that they had to follow the rule, you said I don't

7 agree with this rule, right?

8   A. Yes.

9   Q. You don't think that was insubordinate?

10   A. No.

11   Q. Why not?

12   A. I find it -- it's funny that the reasons

13 I listed never got into circulation, because I listed

14 that the rules at Benning were not being administered

15 fairly; one, because subsequent to the issuance of the

16 rule, these very supervisors, which you call, several

17 of their staff were observed to be violating the same

18 rule and nothing was done to it.

19      Two --

20   Q. How do you know nothing was done?

21   A. Because Mr. Karnezis was issuing tickets

22 to so-called violators and none were issued to them.

## Page 97

1   Q. How do you know?

2   A. Because I went around and checked.

3   Q. Every day?

4   A. Or had someone check daily.

5   Q. Who did you have check daily?

6   A. I checked as I walked around there.

7   Q. You said you sent people to check daily.

8 Who did you send?

9   A. There were -- there were -- there were --

10 he's since retired now.

11   Q. Who did you send?

12   A. What was -- I'm trying to remember his

13 name, but he was the one that checked. I had Calvino

14 Stanford to check.

15   Q. You had Mr. Stanford check.

16      Who else did you have check?

17   A. Let me see. God, he's going to kill me

18 for forgetting his name. His name doesn't come right

19 now to me, but he has since retired from the firm.

20 And both of them checked.

21      And, in fact, he took pictures of -- he

22 took pictures of people actually in -- these people

---

Page 98

1 were bargaining unit people who -- who were in the
2 same spots that -- that -- that Mr. Karnezis did not
3 issue any ticket or he didn't ask them to move and
4 that was from the one I said.
5        The second part of that was that I
6 requested a waiver of Mr. Karnezis for the two ladies
7 who were in my section, because they on frequent
8 occasions worked late. And I didn't think that the
9 lighting at -- within that vicinity was adequate
10 enough for their security.
11        And I requested that there was a waiver
12 for those two individuals, particularly on the nights
13 that -- or evenings -- that they had to work late.
14 And I never got a response from Mr. Karnezis.
15     Q. The Benning lot is surrounded by a fence,
16 isn't it?
17     A. The whole plant is surrounded by a fence.
18     Q. And there's security guards on the
19 premises, right?
20     A. To answer your question, there are
21 security guards on the plant, yes.
22     Q. And who are the two people that you asked

---

Page 99

1 for a waiver for?
2     A. Renee Carter-Moton and Rosa Daniels.
3 Those are the two.
4     Q. Did you have other women in -- who were
5 subordinates of yours who --
6     A. At the time there weren't.
7     Q. They were the only two women?
8     A. Yes, at the time.
9     Q. Did you make this request in writing?
10     A. Yes.
11     Q. To whom?
12     A. To Mr. Karnezis. It should have been
13 part of what you have.
14     Q. And when did you make that request in
15 writing?
16     A. It was -- it would have been before -- it
17 would have been before he came back and went to
18 Mr. Farrell to get the order taken.
19     Q. So between the time Mr. Karnezis first
20 told you about the policy and the time that
21 Mr. Farrell had to tell you to implement the policy
22 for your workers, you had asked for a waiver?

---

Page 100

1     A. Yes.
2     Q. When Mr. Farrell came back to you and
3 said Mr. Browne, you've got to enforce this policy,
4 did you ever say -- did you say to him I'm trying to
5 get a waiver?
6     A. Yes, I did.
7     Q. And it's true that management told you at
8 or about this time -- they told everybody at or about
9 this time -- that the policy is under review, but
10 everybody has got to follow it until we finish the
11 review, right?
12     A. I don't recall that specific discussion.
13     Q. That could have happened, you just don't
14 know?
15     A. I just don't recall it.
16     Q. Okay. But it could have happened, right?
17     A. I don't -- I'm not going to say yes to
18 that either. I just don't recall it, so I can't say
19 that -- that it did.
20     Q. What was the other issue that led to the
21 DML?
22     A. The communication with the union. There

---

Page 101

1 was a case that I was listening to my job processors
2 relative to the firm when the distribution designer
3 agreement was made. And they had articulated a
4 response. And, evidently, when the distribution
5 agreement was being made, it appeared as if the firm
6 had -- had not listened to their response or requests.
7     Q. Let's back up a little bit.
8     A. Okay.
9     Q. In 2004 PEPCO was negotiating with its
10 bargaining unit employees on a new contract, right?
11     A. Yes.
12     Q. Negotiation of a contract is a pretty
13 important thing, right?
14     A. Yes.
15     Q. It's going to govern the terms and
16 conditions for somebody's employment for some period
17 of time into the future, right?
18     A. Yes.
19     Q. And PEPCO had a negotiating team that was
20 charged with interfacing with the union to negotiate a
21 contract, right?
22     A. As far as I'm aware, yes.

---

Page 102

1   Q.  And they negotiated with the union for
2 months, right?
3   A.  Yes.
4   Q.  On all kinds of different issues, right?
5   A.  Yes.
6   Q.  And you knew at the time in 2004 that one
7 of the issues that PEPCO was negotiating with the
8 union was pay classifications for certain employees,
9 right?
10   A.  Yes.
11   Q.  And you knew that this had been under
12 discussion for some time with the union, right?
13   A.  Yes.
14   Q.  As a matter of fact, you were not a
15 member of PEPCO's negotiating team, right?
16   A.  I was not.
17   Q.  In fact, you've never been a part of
18 PEPCO's negotiating team?
19   A.  I was not.
20   Q.  That's somebody else's job, right?
21   A.  I presume so.
22   Q.  And it involves more than one person,

Page 103

1 right?
2   A.  Yes.
3   Q.  There's a team of them?
4   A.  Yes.
5   Q.  And nobody at PEPCO in management ever
6 told you in 2004 that you had the right to negotiate
7 on PEPCO's behalf with the union, right?
8   A.  You're correct.
9   Q.  And nobody ever said that you could have
10 any contact with the union about the subject matter of
11 the negotiations, correct?
12   A.  Yes.  Go ahead.
13   Q.  And as a matter of fact, you knew that as
14 a supervisor of the company, because you told me this
15 this morning, it was your responsibility to advocate
16 the company's position and implement the company's
17 policies, right?
18   A.  Yes.
19   Q.  You weren't an advocate for the
20 bargaining unit employees, right?  That's not your
21 job, right?
22   A.  I disagree with how you phrased that

Page 104

1 question, so I'm not going to answer it.
2   Q.  Okay.  Don't answer that question, but
3 how about this one:
4      Nobody at any time during this period had
5 any discussion with you in which you were left with
6 the impression that you were allowed to go to the
7 union on issues that were in negotiation?
8   A.  Yes.
9   Q.  Who told you that?
10   A.  Okay.  Could -- during the time the two
11 employees went to the union and inquired about why
12 their case was not listened to, the union suggested to
13 them that the only way that they could get a
14 re-hearing of their case was -- and forgive me if
15 I'm -- the term is -- is -- rather, I was supposed --
16 I -- I, as their supervisor, could request a side bar
17 arrangement.  I think that's what it was called.
18   Q.  A side agreement?
19   A.  Yeah, a side agreement with my manager.
20 That was what was told to me by the union.
21   Q.  Was it told to you by the union?
22   A.  Um-hmm (affirmative).

Page 105

1   Q.  So you talked to the union?
2   A.  Well, the ladies went and spoke to the
3 union.  And in the discussion that followed from that,
4 I was told by them and the union that in order to get
5 their issue addressed or re-heard, then that was the
6 procedure to follow.
7   Q.  Right.  So what actually happened, isn't
8 it, Mr. Browne, is that the two employees, Renee and
9 Rosa, talked to the union?
10   A.  Um-hmm (affirmative).  Yes.
11   Q.  They came back and talked to you?
12   A.  Yes.
13   Q.  And told you what the union said, right?
14   A.  Yes.
15   Q.  And then you called up Joe Hawkins at the
16 union, right?
17   A.  I believe I did.
18   Q.  And you called up to talk to Hawkins at
19 the union about an issue that was being negotiated
20 between PEPCO and the union, right?
21   A.  Well, I did not interpret it as that.  I
22 interpreted it that the two employees working for me

## Page 106

1 had an issue and there was a way to address the issue.
2 And I was responding to address that issue. I did not
3 look at it from the perspective which you are
4 advancing to me. That's my honest truth.
5    Q. That's the perspective that management
6 looked at it from, right? Isn't it?
7    A. I didn't hear you.
8    Q. Isn't that the perspective that
9 management looked at it from?
10    A. I did not interpret it that way.
11    Q. So the two employees came back to you and
12 you called up the union, right?
13    A. Yes.
14    Q. And you talked about their
15 classifications, right?
16    A. Yes.
17    Q. And then not only that, but several days
18 before the bargaining unit members' vote on the
19 agreement, you actually wrote a memorandum critical of
20 the company's position and sent it to the union,
21 right?
22    A. I did not send it to the union. I

## Page 107

1 sent -- the letter was addressed -- the letter was
2 addressed to Mr. Farrell, as -- as I was requested to
3 do. I cc'd -- I copied the union. Okay? And this is
4 where -- this is where a critical difference lies.
5    Q. So --
6    A. Let me finish what I've got to say.
7       There's a significant cultural difference
8 here. The environment in which I was raised, which is
9 a British environment, my interpretation of a CC, a
10 copy, is for information only. It was not -- but the
11 action was from me to Mr. Farrell. I was requesting
12 Mr. Farrell to review the situation, as I was
13 instructed that was the only way it was to be done.
14       Okay. I cc'd the union, as it is common
15 within the English language, at least the Queen's
16 English that I'm familiar with, that you provide a CC
17 to the people that you were engaging or talking to,
18 because I also copied the union. I copied the two
19 individuals with whom I was writing about. Okay?
20       If -- if you -- if -- if that was -- if
21 that was being interpreted as a direct action
22 communication, then I think there is a significant

## Page 108

1 cultural difference in terms of how I interpret the
2 English language.
3    Q. Where were you raised?
4    A. In Barbados.
5    Q. You did, in fact, CC your memorandum to
6 Mr. Farrell to Mr. Coleman at the union?
7    A. Yes.
8    Q. And to Mr. Joe Hawkins at the union,
9 correct?
10    A. Yes.
11    Q. And by CCing it to them, you actually
12 sent them a copy of the memorandum, right?
13    A. Yes, I did.
14    Q. Because you wanted them to have it,
15 right?
16    A. For information.
17    Q. You wanted them to see what you wrote
18 there, right?
19    A. Yes.
20    Q. And in that memorandum that you cc'd on
21 Mr. Coleman and Mr. Hawkins at the union, you were
22 critical of PEPCO's position that it had taken with

## Page 109

1 respect to the classification of these two employees,
2 right?
3    A. Yes.
4       (Thereupon, Browne Deposition Exhibit
5       Number 3 was marked for identification.)
6       BY MR. FLANAGAN:
7    Q. Mr. Browne, I've handed you Exhibit
8 Number 3, which is an E-mail from you that attaches
9 your June 23rd memorandum to Mr. Farrell.
10       Is that, in fact, your E-mail?
11    A. Yes, it is.
12    Q. And that indicates that you were sending
13 this Farrell memorandum to Coleman and Hawkins at the
14 union, right?
15    A. Yes, I did.
16    Q. Prior to sending this memorandum to
17 Farrell and to the union, you didn't go to Farrell at
18 PEPCO and say listen, I've got two unhappy employees,
19 what are we going to do about this, did you?
20    A. I don't remember if I did.
21    Q. You didn't call up PEPCO's industrial
22 relations department and ask the negotiating team

Page 110

1  whether you could communicate with the union about
2  this classification issue, did you?
3      A.  No, I did not.
4      Q.  You didn't ask anybody for permission to
5  do that?
6      A.  I didn't think I needed permission to do
7  that.
8      Q.  Okay.  And the memorandum that's attached
9  to the E-mail, you wrote that, right?
10     A.  Yes.
11     Q.  And in the second line you say I'm,
12  again, pleading to have what I fervently determine to
13  be a grave management injustice corrected or
14  ameliorated, right?
15     A.  Where?
16     Q.  First page of the memorandum.
17     A.  Yes.
18     Q.  And the grave management injustice that
19  you were trying to correct here was what you thought
20  was the misclassification of two employees?
21     A.  Yes.
22     Q.  Why do you think it was unjust that they

Page 111

1  were classified as they were?
2      A.  If you read the remainder of the
3  paragraph, that's what it is.  I don't know if I need
4  to repeat that.
5      Q.  Why did you think that it was unjust for
6  them to be classified the way they were?
7      A.  Because years before when I joined that
8  section, my predecessor had indicated to me that he
9  spent several years in order to raise the
10  classification, and not only raise the classification,
11  but change the job title of the people that worked for
12  him inasmuch as they performed duties that were above
13  and beyond what the other people within the other
14  groups did.
15     Q.  So you --
16     A.  As --
17     Q.  Go ahead.  I'm sorry.
18     A.  As an example, the people in -- the
19  classification in the State of Maryland did only the
20  state.  I mean, they -- they only did permits for the
21  respective either Prince George's County or Montgomery
22  County and with the State.

Page 112

1      Within the District, they only dealt with
2  the District Government.
3      The positions within our section, they
4  not only did the District Government, because the
5  section did work for the entire jurisdictions, they
6  did permitting within the District of Columbia.  They
7  did permitting within Montgomery County, within Prince
8  George's County, but they also did -- since we
9  communicated with governments -- they did permits and
10  permitting related work for all of the federal
11  government, which included the FHA, the -- let me
12  see -- the -- the -- any of the federal government
13  areas that we did, in addition to the railroads, which
14  was above and beyond what the other groups did.
15     That was the main crux that my
16  predecessor had -- had gone through, like, three or
17  four years to raise that job processing -- I mean, the
18  position that they had.
19     And I was just simply saying if you are
20  going to upgrade the others within the jurisdictions,
21  Maryland and/or the District, then you are, in fact,
22  you know, upgrading them to a position and leaving the

Page 113

1  ones that did work in all of the jurisdictions and
2  beyond out.  That's all I was simply saying.
3      Q.  So is it fair to say, then, Mr. Browne,
4  that when you said that you thought it was a grave
5  injustice that these two were left at the lower level,
6  it's because there were other people in the company
7  who were working in a similar duty --
8      A.  Capacity.
9      Q.  -- who were at the higher classification?
10     A.  Who were being raised to a higher
11  classification.
12     Q.  Right.  So because these other people in
13  the company who did similar work were raised, these
14  people should be raised too?
15     A.  Yes, sir.
16     Q.  You don't think -- it wasn't your
17  contention here in this document, and it's not your
18  contention now, that these two people, Rosa and Renee,
19  were left at the lower classification because of their
20  race, is it?
21     A.  Well, I don't know.  And I can't respond
22  to that saying that -- yes or no.  I just don't know.

Page 114

1   Q. You do not know. So you're not
2 contending here that they were kept at that
3 classification because of their race?
4    A. No, but there is a possibility that it
5 was.
6   Q. Okay. As a matter of fact, you met with
7 Mr. Negusie on this issue, correct?
8    A. Yes.
9   Q. In July?
10    A. Yes.
11   Q. And Mr. Negusie provided you some
12 information about the classifications of people and
13 you told him then that this classification for these
14 two employees, as a result of the information he gave
15 you, had nothing to do with their race?
16    A. That's why I said -- that's why I said
17 no, I didn't think so, but, I mean -- that's why --
18 that's why I was not emphatic in responding to your
19 question.
20   Q. And you said nothing in this document
21 that these people, Renee and Rosa, were kept at the
22 lower classification because of their race, right?

Page 115

1    A. There you go. I did not.
2   Q. And if you ever had any thought that it
3 was because of their race, that thought went away in
4 July after talking to Mr. Negusie and you realized,
5 you know, it might be something that's not fair going
6 on, but it's not because of their race, right?
7    A. You're absolutely correct.
8   Q. On page two of the letter in the first
9 paragraph -- would you just take a look at that?
10     And this is the memorandum that you sent
11 to Farrell and copied on the union?
12    A. Okay.
13   Q. You say there I have been informed of all
14 developments and have concluded that there has been
15 little, if any, effort on PEPCO's management to truly,
16 fairly and honestly address the above issue.
17     You wrote that, right?
18    A. Yes.
19   Q. You didn't think at the time that you
20 sent this in that there was something wrong or
21 inappropriate for a management exempt employee for
22 PEPCO to send a memorandum to the union that

Page 116

1 criticized PEPCO for being untruthful, unfair and not
2 honest?
3    A. No.
4   Q. Well, PEPCO management certainly told you
5 after you sent this that it was inappropriate, didn't
6 they?
7    A. Well, that's their interpretation of it,
8 yes.
9   Q. Didn't they?
10    A. Yes.
11   Q. As a matter of fact, PEPCO management saw
12 you communicating with the union and almost
13 immediately told you that this was inappropriate,
14 right?
15    A. I think I was called -- I was spoken to
16 by Mr. -- Mr. Gausman, yes.
17   Q. Mr. Gausman is vice president of the
18 company, right?
19    A. Yes.
20   Q. That's a high-level person, right?
21    A. Yes.
22   Q. And as a matter of fact, you sent this

Page 117

1 E-mail, which is Exhibit Number 3, to Farrell and the
2 union on the eve of a vote with the union, right?
3    A. I was not -- to be honest with you -- I'm
4 going to answer you honestly. And I asked the company
5 if they would -- would undertake a lie detector test.
6 I was not aware of the union vote. And the issue with
7 the vote, as I told you earlier, did not enter my
8 mind. I was simply responding to a request from my
9 two workers and trying to get an issue addressed.
10 That was it.
11   Q. You knew a vote was coming up?
12    A. I did not know the vote was coming. I
13 said that and I said that repeatedly before. I was
14 not aware the vote was coming up.
15    (Thereupon, Browne Deposition Exhibit
16    Number 4 was marked for identification.)
17    BY MR. FLANAGAN:
18   Q. You never thought to ask anybody at
19 management about whether your memo that you had copied
20 on the union would somehow impact the vote?
21    A. I did not think it was and I don't
22 believe that it did.

Page 118

1    Q. I've handed you Exhibit Number 4,
2 Mr. Browne, which is, in fact, an E-mail from
3 Mr. Gausman to you and Mr. Wolverton and Mr. Farrell,
4 dated on the same day that you sent the memo, which is
5 Exhibit Number 3, right?
6    A. Um-hmm (affirmative). Yes. Yes, sir.
7    Q. And Gausman is the vice president?
8    A. Yes, he is.
9    Q. And he cc'd on this Mr. Wolverton of
10 PEPCO who is in charge of industrial relations, right?
11    A. Yes.
12    Q. And he says, please do not take any
13 additional action on this issue until I can review
14 your information. Then he goes on to say, I will tell
15 you that your correspondence is totally inappropriate
16 for a senior management employee and one day before a
17 major union vote. I will discuss this issue with you
18 at a later date. You should know better than to copy
19 union officials before discussion and agreement with
20 your manager of potential union side agreements.
21        You got this E-mail, right?
22    A. Yes, I did.

Page 119

1    Q. And you got it on the night that it was
2 sent, right? You read it that night, right?
3    A. No, I would have read it the next
4 morning.
5    Q. You recall sitting here today reading it
6 the next morning?
7    A. Yes.
8    Q. And you knew when you read it that
9 Mr. Gausman was not happy that you had sent this to
10 the union?
11    A. Yes.
12    Q. And you knew that Mr. Gausman told you
13 that it was inappropriate for you to have any
14 communication with the union about a side agreement,
15 right?
16    A. Yes.
17    Q. And you knew that he didn't want you to
18 do it again, right?
19    A. Yeah. Yes.
20    Q. And you knew that that was an expectation
21 for you as a supervisor, that you weren't going to
22 communicate with the union?

Page 120

1    A. Yes.
2    Q. And you did after that, didn't you?
3    A. I provided a copy of the -- the guy asked
4 a question and I responded to him.
5    Q. Right. So after you got Exhibit
6 Number 4, when Mr. Gausman told you not to have any
7 contact with the union, you talked to Mr. Hawkins on
8 the phone, right?
9    A. Yes.
10    Q. And you talked to him about the side
11 agreement, right?
12    A. No, I -- I think I responded to
13 Mr. Hawkins. He sent an E-mail to me, I believe, and
14 I -- and he asked me what's the status of it. And I
15 told him that as far as I was aware, that it was being
16 addressed and he would be informed when there was
17 action taken.
18    Q. Why did you communicate with Mr. Hawkins
19 if Mr. Gausman told you not to do it?
20    A. He says to take any additional action. I
21 do not -- I did not -- I mean, an action is -- I -- I
22 have a different interpretation of what action means.

Page 121

1    Q. So you thought you could talk to the
2 union, but not take action?
3    A. I don't consider talking to the union
4 as -- as an action.
5    Q. You knew when you read this that you
6 weren't supposed to be communicating with the union,
7 right?
8    A. No, I -- I disagree with that
9 interpretation. I honestly do. I really do.
10    Q. What did you think you were prohibited
11 from doing?
12    A. Well, I mean -- I mean -- okay. Let
13 me -- let me calm myself.
14        I was prohibited from engaging in any
15 action, which is, you know, taking any further action.
16 I did -- I did not write anything, other than
17 responding to a question that the union asked. That's
18 not action.
19        An action would be if I went to
20 Mr. Farrell and was telling Mr. Farrell well, do this
21 and do that and do that. That's an action. A copy of
22 a communication to tell -- yes, it's just as if

## Page 122

1 someone called you on the phone, do you not answer the
2 phone?
3    Q.  Did it ever dawn on you when Mr. Hawkins
4 contacted you to say something like listen, we
5 shouldn't be talking about this?
6    A.  I believe I may have said that.
7        (Thereupon, Browne Deposition Exhibit
8        Number 5 was marked for identification.)
9    BY MR. FLANAGAN:
10    Q.  The Court Reporter has handed you Exhibit
11 Number 5, which is a July 9th E-mail from you to
12 Mr. Hawkins.
13        Do you recognize this?
14    A.  Yes.
15    Q.  This is, in fact, an E-mail that you
16 wrote to Mr. Hawkins at the union, right?
17    A.  Um-hmm (affirmative).  Yes.  Yes, I did.
18    Q.  In which you talk about this experience
19 has really stained my feelings towards both the union
20 and PEPCO, right?
21    A.  Yes.
22    Q.  So, and again, in this E-mail you were

## Page 123

1 being critical of PEPCO?
2    A.  Yes.
3    Q.  And making it clear to the union that you
4 did not agree with what PEPCO was doing, right?
5    A.  With respect to the two ladies under my
6 employ.
7    Q.  You don't think that was being
8 insubordinate?
9    A.  No.
10    Q.  You don't think that was not fully
11 implementing the policies and directives of PEPCO?
12    A.  No.
13    Q.  Why didn't you copy this E-mail on
14 Farrell and Gausman and Wolverton and all the people
15 that you copied the first E-mail on, Exhibit Number 3?
16    A.  What?
17    Q.  You copied Exhibit Number 3 on a whole
18 slew of people, right, Gausman, Appuglies, it went to
19 Farrell?
20    A.  Yes.
21    Q.  Why didn't you send Exhibit Number 5 to
22 all those people?

## Page 124

1    A.  I didn't think it was necessary.  I was
2 just simply responding to a question he asked me.
3    Q.  It's really the case, isn't it,
4 Mr. Browne, that the reason you didn't send it to all
5 those people is because you knew that you shouldn't be
6 talking to Hawkins and that management would be angry
7 if they found out that you did?
8    A.  That's not true.  That is simply not
9 true.
10    Q.  What is striker contingency training?
11    A.  What?
12    Q.  What is striker contingency training?
13    A.  Striker?
14    Q.  Striker contingency training.  Does that
15 mean anything to you?
16    A.  No.
17    Q.  Do you remember that -- sorry, it's
18 strike contingency training.  Does that phrase mean
19 anything to you?
20    A.  Strike contingency -- I guess it does to
21 some extent.
22    Q.  Well, do you recall that in June of 2004

## Page 125

1 right before your -- your E-mail communications with
2 Hawkins and Coleman at the union, that PEPCO conducted
3 strike contingency training for the supervisors?
4    A.  To be honest with you, I do not remember
5 that.
6    Q.  Does it help refresh your recollection if
7 I tell you that during the strike contingency
8 training, management was told about the possibility of
9 a strike in the event the union agreement wasn't
10 ratified and that if you had any contact from the
11 union, you should bring it to the attention of the
12 negotiating team?
13    A.  I do not remember that.
14    Q.  That could have happened, you just don't
15 remember it?
16    A.  No, it -- it -- I just don't remember it.
17 And as I indicated in there, I have worked -- in other
18 documents -- I've worked with -- at WASA with four
19 unions and I've communicated with the leaders of those
20 unions up until and throughout any discussion.
21        And as I indicated on there, I find the
22 relationship at PEPCO and the unions to be really,

Page 126

1 really, really adversarial. And I find it distasteful
2 for the way how over the years -- and this is the only
3 operation that I've worked at in all the places I've
4 worked where the relationship between the union and --
5 and management has been so adversarial.
6        And I find it really distasteful in a
7 working environment, because the union people are the
8 very people that you depend on out in the field. And
9 I find PEPCO's management approach to the union to be
10 significantly problematic.
11        And from the position that I come, like I
12 says, I was a division chief, which is senior to any
13 of the managers that I have now, when I was working
14 for WASA, and I always, always, always communicated
15 directly with the union leadership. And, in fact --
16    Q. Even during negotiations?
17    A. Yes, I did, even -- and that
18 communication with the unions seriously prevented a
19 lot of problems. And I can remember one instance
20 where one guy was -- was -- was -- had a drug problem.
21 And I went to the union and said look, what should I
22 do; he's an excellent employee but he has -- and they

Page 127

1 suggested why don't you -- there's a District program,
2 why don't you send him to drug rehab. And -- and they
3 did.
4        I mean, and that relationship would have
5 never happened if I was working at PEPCO looking at
6 the way how the relationship between the union and the
7 PEPCO -- I mean, and -- and management is. And I find
8 it really sad.
9    Q. Right. But the truth is --
10    A. Go ahead.
11    Q. -- is it not, Mr. Browne, that at no
12 point in 2004 or at any other point at PEPCO were you
13 charged with the responsibility of working with or
14 negotiating with the union on contract issues?
15    A. No, I didn't think I had to get a charge
16 to communicate with the union. And that's my honest
17 answer.
18    Q. We're going to break here for lunch in a
19 couple of minutes, but I'm going to go through a
20 couple of things first.
21        (Thereupon, Browne Deposition Exhibit
22        Number 6 was marked for identification.)

Page 128

1    BY MR. FLANAGAN:
2    Q. This is an E-mail that you received, is
3 it not, from Mr. Karnezis on April 16, 2004?
4    A. Yes.
5    Q. Do you recall receiving this at the time?
6    A. Yes.
7    Q. And this is an E-mail in which he's
8 asking that you get your subordinates in compliance
9 with the parking policy, correct?
10    A. Yes.
11        (Thereupon, Browne Deposition Exhibit
12        Number 7 was marked for identification.)
13        BY MR. FLANAGAN:
14    Q. The Court Reporter has handed you Exhibit
15 Number 7. This is an E-mail that you sent to
16 Mr. Karnezis regarding the parking situation on April
17 16, 2004, correct?
18    A. Yes.
19    Q. And you wrote this?
20    A. Yes.
21    Q. And you sent it?
22    A. Yes, I did.

Page 129

1    Q. The last sentence says, if you continue
2 with this apparently personal vendetta?
3    A. Yes.
4    Q. What personal vendetta are you talking
5 about?
6    A. I said it before, I says that the -- the
7 personal vendetta is for him to -- the beginning line
8 I say you are engaged in lengthy -- he would come into
9 my section and he would, to use my English term --
10 accost Miss Carter-Moton. And I thought what he was
11 doing was totally inappropriate.
12    Q. So do you believe he had a vendetta
13 against her?
14    A. Yes, I did.
15    Q. You weren't talking about a vendetta
16 against you?
17    A. No. I can handle him.
18        (Thereupon, Browne Deposition Exhibit
19        Number 8 was marked for identification.)
20        BY MR. FLANAGAN:
21    Q. Exhibit Number 8, this is an E-mail, the
22 bottom E-mail, from you to Mr. Karnezis, also on the

## Page 130

1 morning of April 16, correct?

2    A. Yes.

3    Q. In the first sentence you say you support
4 Miss Carter-Moton's position.

5        What position were you supporting?

6    A. As I had explained earlier, that because
7 she worked late, I had requested in a waiver to him to
8 allow her to move her car on the night that she had to
9 work, and instead of parking in the employee parking
10 lot that was a good distance away from there and was
11 relatively unlit, to be able to park in the
12 surrounding area around building 59.

13    Q. Did she ask for the waiver or did you ask
14 for it?

15    A. She asked me and I, through -- I asked
16 for a waiver for both of them through -- I mean, I had
17 asked the waiver of Ted on their behalf.

18    Q. And was the waiver requested in writing
19 or orally?

20    A. I believe I had requested it in writing.

21    Q. So it was before this E-mail?

22    A. Yes, it would have been before this

## Page 131

1 E-mail.

2    Q. Do you have a copy of that?

3    A. No.

4    Q. You didn't keep a copy? Do you recall
5 having a copy? We can look through those documents at
6 a break. Do you recall having a copy of your request?

7    A. Yes.

8    Q. You do recall having a copy?

9    A. At some point I did. I'm not sure why I
10 don't have it here.

11    Q. Okay. You're looking through a bunch of
12 documents. During the lunch break you can look
13 through those.

14    A. Okay.

15    Q. Towards the bottom of the E-mail you say
16 you have difficulty in understanding this culture of
17 separating employees.

18    A. Yes.

19    Q. When you're talking about separating
20 employees here, you're talking about separating them
21 exempt and nonexempt, right?

22    A. Yes.

## Page 132

1    Q. You're not talking about any other kind
2 of separation?

3    A. No.

4        MR. FLANAGAN: It is almost 5 of 1:00.
5 We'll take about 45 minutes for lunch.

6        (Thereupon, at 12:55, a lunch recess was
7        taken.)

## Page 133

1        AFTERNOON SESSION 12:55

2        BY MR. FLANAGAN:

3    Q. Mr. Browne, prior to lunch I was asking
4 you a series of questions about the DML that was
5 issued the summer before. And I asked you questions
6 about the second E-mail that you sent to the union,
7 which is Exhibit Number 5. And that was on January
8 9th.

9    A. Um-hmm (affirmative).

10    Q. I want to ask you some questions about
11 the period between January 9th and the time that the
12 DML was actually issued.

13        What happened next in the sequence after
14 this E-mail on July 9th? Take a look at Exhibit
15 Number 5. It's an E-mail that you sent to Mr. Hawkins
16 on July 9th.

17        Do you see that?

18    A. Yeah.

19    Q. All right. Then when was the DML issued?

20    A. I think the end of -- July 29th or
21 something like that.

22    Q. What happened between July 9th and the

Page 134

1 issuance of the DML? How did you find out about the
2 DML?
3    A. I had a meeting with Mr. Farrell.
4    Q. When was that meeting?
5    A. I don't remember the date. It would be
6 7-20 or something like that. That's the one she
7 copied to give to you.
8    Q. Was it just a meeting with the two of
9 you?
10    A. Initially, yes.
11    Q. What do you mean initially?
12    A. Well, it was a meeting with him and
13 then --
14    Q. Okay. It was a meeting on or about the
15 20th of --
16    A. Yeah, and then --
17    Q. -- July?
18    A. -- he told me that he needed -- he will
19 get back to me as to a date and time to go downtown,
20. because we were at Benning, so downtown would be
21 Edison Place.
22    Q. What happened at the meeting with

Page 135

1 Mr. Farrell?
2    A. He had indicated that PEPCO was -- was
3 formulating to issue me a formal discipline.
4    Q. Did he say what the discipline was for?
5    A. Yes, it was for the parking issue and the
6 communication with the union.
7    Q. All right. And what did you say in
8 response to that?
9    A. That's when I asked him if he was aware
10 of the --
11    Q. DCOHR complaint?
12    A. Yes. Yes.
13    Q. And he said he was aware of it?
14    A. Yes. He referred to it as the case with
15 Sigafoose.
16    Q. Pardon me?
17    A. He referred to it as the case with
18 Sigafoose.
19    Q. And Mr. Farrell didn't say that the DCOHR
20 had any impact or an effect on the meeting that he was
21 having with you then, did he?
22    A. I don't recall him saying that. I

Page 136

1 just -- he was aware of it and I asked him if he was
2 aware of it and he says he was.
3    Q. And then what happened?
4    A. And I indicated to him that -- that I
5 don't think it was right for them to issue me anything
6 when the case was going. And I told him I would
7 inform my -- my attorney of what they intend to do.
8    Q. Right.
9    A. And I get -- I got the feeling from him
10 that they didn't -- that he did not -- I don't know
11 whether he said it himself, but I got the distinct
12 impression that he did not care about me -- about me
13 informing my attorney.
14    Q. That didn't affect him one way or
15 another?
16    A. No.
17    Q. He was --
18    A. He said they was going to do what they
19 were going to do, regardless of -- of the case with
20 the District and/or with me informing my attorney.
21    Q. And it was your understanding when he
22 said that, that he meant that the company was going to

Page 137

1 take whatever disciplinary action it thought was
2 appropriate, regardless of whether there was this
3 claim?
4    A. Yes. I get the feeling that the company
5 was going to completely ignore the -- the -- any case
6 that was going to be filed. So I -- I felt that --
7 that the company at that point was above the law.
8 That was my honest feeling.
9    Q. What happened next in the conversation?
10    A. What?
11    Q. What happened next in the conversation?
12    A. I think we -- we left.
13    Q. How long did the whole thing last?
14    A. I don't think it lasted -- a matter of
15 maybe minutes.
16    Q. Did you say in your meeting with Farrell
17 that you thought that maybe the non-advancement to a
18 different certification of Renee and Rosa was because
19 of their race?
20    A. I don't think I did. In fact, if I did,
21 I don't remember.
22    Q. As a matter of fact, after that meeting

| Page 146 | Page 148 |
|---|---|
| 1   A. Yes. | 1 say collectively PEPCO. So any one of its senior |
| 2   Q. In exchange for you signing a release? | 2 managers representing as agents of PEPCO did it. And |
| 3   A. Yes. | 3 I'm not -- I don't know how I can answer you that |
| 4   Q. And in any event, you decided that you | 4 question. |
| 5 wanted to come back to PEPCO, right? | 5   Q. Gausman and Farrell and Appuglies were |
| 6   A. Yes. | 6 actually at the DML meeting, correct? |
| 7   Q. And so PEPCO let you come back, right? | 7   A. Yes. |
| 8   A. Yes. | 8   Q. Do you admit that you never heard any of |
| 9   Q. No loss in pay, right? | 9 those three people make any disparaging statements |
| 10   A. No. | 10 about blacks? |
| 11   Q. Mr. Browne, can you identify any white | 11   A. No. |
| 12 employee who had engaged in the conduct that you were | 12   Q. No, you never heard them say that? No, |
| 13 alleged to have engaged in in the DML, but that | 13 you never heard them make any disparaging statements |
| 14 employee wasn't disciplined? | 14 about blacks, is that what you mean by your answer? |
| 15   A. I do not know of any. | 15   A. Yes. |
| 16   Q. Do you know -- strike that. | 16   Q. And you never heard from anybody else |
| 17       Other than the issuance of the DML, which | 17 that these three people made any disparaging |
| 18 went into your record for a period of 18 months, and | 18 statements about blacks? |
| 19 the denial of the promotions that you mentioned this | 19   A. Not that I can recall right now. |
| 20 morning, and the changing of your job duties, which | 20   Q. You went to a mediation at the DCOHR in |
| 21 you mentioned this morning, were there any other ways | 21 July of 2004, correct? |
| 22 that PEPCO retaliated against you for filing the DCOHR | 22   A. Yes. |

| Page 147 | Page 149 |
|---|---|
| 1 claim? | 1   Q. Who was there for PEPCO? |
| 2   A. Well, the -- my review, which was done -- | 2   A. Sigafoose and Attorney Flack. |
| 3 my annual review, which was done at the end of the | 3   Q. You don't know what, if anything, Mr. -- |
| 4 year or for the end of the year made a reference to | 4 Messrs. Gausman, Farrell and Miss Appuglies knew about |
| 5 the DML. | 5 the mediation when they had the DML meeting, do you? |
| 6   Q. Okay. | 6   A. If I don't know about what? |
| 7   A. And I objected to the language that was | 7   Q. Well, at the time that the DML meeting |
| 8 written and I -- that the entire case -- objection | 8 occurred -- |
| 9 meant all the way up to arbitration. | 9   A. Yes. |
| 10   Q. And the evaluation was never changed, | 10   Q. -- you're not aware of anything that |
| 11 correct? | 11 Gausman, Farrell or Appuglies knew about the |
| 12   A. No, because when I challenged it with HR, | 12 mediation, right? |
| 13 I was told that because it was tied to the DML and the | 13   A. Since that's a subjective question, I |
| 14 DML was in my file, then it wouldn't change. | 14 will give you a subjective answer. I believe that all |
| 15   Q. So it did not change, correct? | 15 three of the individuals were aware, because of their |
| 16   A. No. | 16 closeness to Mr. Sigafoose, of what took place at |
| 17   Q. Any other ways that PEPCO retaliated | 17 the -- at the -- at the mediation. |
| 18 against you, other than what you testified to already | 18   Q. Are you aware of any other facts that |
| 19 and this performance appraisal for the 2004 year? | 19 lead you to conclude that they were aware of what |
| 20   A. I cannot think of any right now, sir. | 20 happened at the mediation? |
| 21   Q. Who made the decision to issue the DML? | 21   A. I'm not aware of any facts. |
| 22   A. I don't -- I don't know. I -- I have to | 22       (Thereupon, Browne Deposition Exhibit |

| Page 150 | Page 152 |
|---|---|
| 1     Number 9 was marked for identification.) | 1     Q.  On page three of the performance |
| 2     BY MR. FLANAGAN: | 2  appraisal it indicates that your overall rating for |
| 3     Q.  Mr. Browne, I'm handing you Exhibit | 3  this performance appraisal was fully acceptable, |
| 4  Number 9.  It's a memo that Mr. Farrell sent to you on | 4  correct? |
| 5  September 2nd. | 5     A.  Yes. |
| 6     You received this at the time, did you | 6     Q.  And you've never or you never, up until |
| 7  not? | 7  this point at PEPCO, had received a performance |
| 8     A.  I believe I did. | 8  appraisal that was higher than fully acceptable? |
| 9     Q.  When was the last time you read it? | 9     A.  No. |
| 10     A.  I don't recall the last time I read it. | 10     Q.  That's correct, isn't it? |
| 11     Q.  What does this document say about your | 11     A.  Yes. |
| 12  DCOHR complaint? | 12     Q.  It's true that what you think is unfair |
| 13     A.  It doesn't say.  It doesn't say anything | 13  about this performance appraisal is the rating that |
| 14  about it. | 14  you received on page two for communication, correct? |
| 15     Q.  You told me earlier that Mr. Farrell | 15     A.  Yes. |
| 16  wrote you a memorandum in which he acknowledged the | 16     Q.  And the rating that you received for |
| 17  DCOHR complaint. | 17  communication is one, right? |
| 18     What memorandum are you talking about? | 18     A.  Yes. |
| 19     A.  He did not write me a memorandum saying | 19     Q.  What do you think you should have gotten |
| 20  that I said -- it was a meeting where I was at that I | 20  there? |
| 21  reported on this meeting. | 21     A.  Three. |
| 22     Q.  And this was the meeting that you | 22     Q.  And you think that you would have gotten |

| Page 151 | Page 153 |
|---|---|
| 1  referred to a couple of minutes ago after the July 9th | 1  a three if all this business about the union and the |
| 2  memo -- E-mail? | 2  parking wasn't identified in your appraisal, right? |
| 3     A.  Yes. | 3     A.  Yes. |
| 4     (Thereupon, Browne Deposition Exhibit | 4     Q.  So take a look at page three. |
| 5     Number 10 was marked for identification.) | 5     If you had received a three for |
| 6     BY MR. FLANAGAN: | 6  communication -- |
| 7     Q.  Mr. Browne, you've been handed Exhibit | 7     A.  Yes. |
| 8  Number 10.  You testified a couple of minutes ago that | 8     Q.  -- what would the weighted score have |
| 9  you believe that it was unfair following the DML for | 9  been in the weight rating column? |
| 10  your performance appraisal to reflect the DML. | 10     A.  It would have been a 45. |
| 11     Is this the performance appraisal you're | 11     Q.  Right.  So you multiply 15 percent times |
| 12  referring to?  It might help you to take a look at the | 12  3 and you get 45, right, for the weighted score? |
| 13  first page.  It indicates that this is an appraisal | 13     A.  Yeah. |
| 14  for the period January '04 through December '04.  And | 14     Q.  So you believe that your overall score |
| 15  '04 was the year that you've been talking about in | 15  here should have been 30 points higher than it was? |
| 16  which the DML was issued. | 16     A.  Yes. |
| 17     Is this the performance appraisal for | 17     Q.  So your overall score should have been a |
| 18  that time period? | 18  245? |
| 19     A.  Yes. | 19     A.  Yes. |
| 20     Q.  And this is the performance appraisal | 20     Q.  Which would have turned into a |
| 21  that you say was retaliatory? | 21  performance rating of 2.45, right? |
| 22     A.  Yes. | 22     A.  Yes. |

Page 154

1  Q. And that 2.45, if you had gotten it,
2 which you think you should have, would have still been
3 in the fully acceptable level, right?
4  A. Yes.
5  Q. It would not have moved things up to
6 outstanding, right?
7  A. Yes.
8  Q. You've already told me today that you
9 have no way of knowing and it's just your hunch
10 whether the DML or this appraisal impacted your
11 non-selection for the positions you posted for, right?
12  A. I missed the question.
13  MR. FLANAGAN: You can read the question
14 back.
15  (The record was read as requested.)
16  THE WITNESS: Yes. Correct.
17  BY MR. FLANAGAN:
18  Q. Under communication where you were given
19 a one, there's a description that appears on pages
20 four and five that summarizes what management had
21 already told you was your problem with talking to the
22 union, right?

Page 155

1  A. Yes.
2  Q. This problem you had with communication
3 in your 2004 appraisal based on your talking to the
4 union, had you had gotten higher scores on the
5 communication element previously?
6  A. Yes.
7  Q. The truth is that even prior to this time
8 you had received a one for communication, right?
9  A. I don't recall receiving a one for
10 communication.
11  Q. Well, let me show you.
12  (Thereupon, Browne Deposition Exhibit
13  Number 11 was marked for identification.)
14  BY MR. FLANAGAN:
15  Q. If you take a look at Exhibit Number 11,
16 which is your performance appraisal for 2002.
17  What score did you get for communication
18 then on page three of the document?
19  A. I got a one.
20  Q. You got a one. So back in 2002 you had
21 already been identified by your supervisor as somebody
22 who had a problem with communication, right?

Page 156

1  A. Yes.
2  Q. As a matter of fact, if you take a look
3 at page four where it gives a description of why you
4 only received a one for communication, it says, quote,
5 in some cases his personal views, which were in
6 conflict with company direction, were also
7 communicated to employees.
8  Do you see that?
9  A. Yes.
10  Q. That's pretty similar to the problem that
11 you were having in 2004 when you went to the union,
12 right?
13  A. I guess so.
14  Q. Right. And back in 2002 they also say
15 there that although Phil ultimately followed my
16 direction, when discussing this issue with a group of
17 exempt and nonexempt employees, he stated that he did
18 not agree with the policy.
19  That was a comment on you in 2002, right?
20  A. Yes.
21  Q. It's pretty similar to the problem that
22 you had in 2004, isn't it?

Page 157

1  A. I assume that you have the year before?
2 From a statistical perspective it makes more sense to
3 look at the year before, rather than two years before.
4 Two years before I just joined the firm and I was
5 just, you know, kind of getting my feet wet into
6 things.
7  Q. But you're not going to sit here and deny
8 that back in 2002, before you thought that Mr. Farrell
9 was out to get you, you were having problems with
10 communication, right?
11  A. What?
12  MR. FLANAGAN: Can you read that question
13 back?
14  (The record was read as requested.)
15  THE WITNESS: Yeah, I agree with you, but
16 it depends --
17  BY MR. FLANAGAN:
18  Q. Okay. You don't agree it's a good
19 statistical showing, I understand that.
20  A. No, let me correct what I just said. I
21 asked you to look at the year in between these two.
22 You selectively choose to find 2000 -- from the year

Page 186

1    A.  That portion of the evaluation, yes.

2    Q.  Who said that?

3    A.  I think it would have been the -- HR,
4 Karen Gentry-May.

5    Q.  And when did she say that?

6    A.  It would have been during the appeal
7 process.

8    Q.  During the appeal process of your --

9    A.  Of that.

10    Q.  -- evaluation?

11    A.  Yes.

12    Q.  Mr. Farrell responded to your appeal of
13 the evaluation, didn't he?

14    A.  I believe he has.

15    Q.  Take a look at Exhibit Number 10, which
16 is your evaluation for the '04 period.

17       You complain that communication was --
18 the rating was unfairly marked down as a result of the
19 union issue.  Do you remember that?

20    A.  Yes.

21    Q.  You don't contend that any other portion
22 of that evaluation was unfairly marked down because of

Page 187

1 the DML, do you?

2    A.  I don't remember if I had.  I do remember
3 this one specifically.

4    Q.  The one being communication, right?

5    A.  Yes.

6    Q.  And there's nowhere in the DML -- I'm
7 sorry, there's nowhere in the evaluation in which
8 the -- strike that.

9       There's no part of the evaluation that
10 refers to the DML, right?

11    A.  No, but the language is the same.

12    Q.  Well, they're not talking about the DML.
13 They're talking about the facts that underlied the
14 DML, correct?

15    A.  You're separating the two and I don't
16 separate them.

17    Q.  Okay.  Other than what you've testified
18 to today, is there any other way that PEPCO retaliated
19 against you or treated you unfairly as a result of you
20 filing the DCOHR charge?

21    A.  Not that I can think of.  I believe I've
22 gone through the sum total of the things that were

Page 188

1 subsequent to the issuance of the DML, which included
2 my treatment with -- in 2004 when the separation was
3 made.

4    Q.  In 2004 when what?

5    A.  When the separation was made.

6    Q.  What do you mean the separation?

7    A.  Or the -- from the -- the dissolution of
8 my old department.

9    Q.  Okay.  Before we close the deposition,
10 you brought with you a whole bunch of documents today.
11 You brought with you some documents relating to PEPCO
12 today, correct?

13    A.  Yes.

14    Q.  Have you given all of them to my
15 associate or are there other PEPCO documents?

16    A.  These are not -- I need you to clarify
17 what you mean.

18    Q.  Let's back up.

19       Earlier in this deposition you gave my
20 associate a stack of documents that you brought with
21 you that relate to this case.

22       Do you recall that?

Page 189

1    A.  Yes, it was sitting on the table here.

2    Q.  I'm going to mark these as the next
3 exhibit.

4       (Thereupon, Browne Deposition Exhibit
5       Number 16 was marked for identification.)

6       BY MR. FLANAGAN:

7    Q.  And I'll represent to you that this is
8 what you had given me before and I've given a copy
9 back to your lawyer.

10       Are these the only documents in Exhibit
11 Number 16 that you brought with you today that relate
12 at all to the allegations in this case?

13    A.  I really don't know how to respond to
14 that, because what I put on the table here was put
15 here and this is what you got a copy.  What I have
16 here relate to here, but these are my copies of
17 what -- of the whole -- the whole case.

18       As far as the response to the questions
19 you asked, you would have those in the documents that
20 the attorney provided.

21    Q.  Do you have any documents with you today
22 that relate to this case that you haven't provided us?